**Barney QUILTER, et al., Plaintiffs,**

v.

**George V. VOINOVICH, et al., Defendants.**

**No. 5:91CV–2219.**

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 22, 1997.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, OH, for Barney Quilter, Thomas E. Ferguson, Glen Achtermann, Sam Barone, Sandra Guy, Robert McLaughlin, James B. McCarthy, Gladys Henson, Tom Kilbane, Robert H. Trainer, A. Wane Bussler, James P. Speros, Kenneth Thorne, Charles Walker, William Shanklin, Clarence Lumpkin, Tyrone Riley.

Timothy F. Scanlon, Scanlon & Gearinger, Akron, OH, Thomas I. Atkins, Sr., Brooklyn, NY, Armistead W. Gilliam, Jr., Ann Wightman, Laura A. Sanom, Faruki, Gilliam & Ireland, Dayton, OH, for William L. Mallory.

Orla Ellis Collier, III, Norton Victor Goodman, James F. DeLeone, Mark D. Tucker, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for George V. Voinovich, Stanley J. Aronoff, Robert A. Taft, II.

Charles M. Rosenberg, Maynard A. Buck, III, Jeremy Gilman, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, for James R. Tilling.

Jack Gregg Haught, Benesch, Friedlander, Coplan & Aronoff, Columbus, OH, Andrew S. Bergman, Office of Atty. Gen., Columbus, OH, for State of Ohio, party in interest.

Elizabeth Johnson, Rebecca J. Wertz, Daniel H. Claman, Dept. of Justice, Civil Rights Div., for U.S.

Armistead W. Gilliam, Jr., Ann Wightman, Faruki, Gilliam & Ireland, Dayton, OH, for Paul Mechling, Mary Abel, Ronald Gerberry, Richard Cordray.

Before JONES and MOORE, Circuit Judges, and DOWD, District Judge.

## OPINION

MOORE, Circuit Judge.

The question before this court is whether the Ohio Apportionment Board's consideration of race in its 1992 redistricting plan violated the Equal Protection Clause of the Fourteenth Amendment. We hold that because the plaintiffs have failed to make a threshold showing that the defendants subordinated traditional districting principles to consideration of race, strict scrutiny of the challenged districts is not applicable. Applying rational basis scrutiny, we conclude that the plan does not violate the Equal Protection Clause.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case is before this court on remand from the United States Supreme Court. Because we focus on application of the legal analysis outlined by the Supreme Court in recent cases, we will not revisit the facts and procedural history of this case in detail. The tortuous history of this litigation, which first came to this court in the form of a suit based on vote dilution and population deviation, was more thoroughly recounted in a previous opinion of this court. *See Quilter v. Voinovich,* 912 F.Supp. 1006, 1011–14 (N.D.Ohio 1995).

This litigation arose from the reapportionment of Ohio's electoral districts following the 1990 federal census. The plaintiffs include the Democratic members of the Republican-dominated Apportionment Board; the defendants are the Republican members of the Board and James R. Tilling, who drew the majority's plan. After the Supreme Court reversed this court's judgment for the plaintiffs on claims of vote dilution and remanded for further proceedings on a Fourteenth Amendment claim involving population deviation, *see Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), this court permitted the plaintiffs to amend the complaint in light of the then-recent decision in *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) ("*Shaw I*") which recognized an equal protection claim of racial gerrymandering. *Quilter v. Voinovich,* 157 F.R.D. 36 (N.D.Ohio 1994). This court held in favor of

the defendants on the population deviation issue, *Quilter v. Voinovich,* 857 F.Supp. 579 (N.D.Ohio 1994), but held in favor of the plaintiffs on the *Shaw* claims. *Quilter v. Voinovich,* 912 F.Supp. 1006 (N.D.Ohio 1995). The Supreme Court vacated the latter opinion and remanded for further consideration in light of the recent opinions in *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"). *Voinovich v. Quilter,* — U.S. ——, 116 S.Ct. 2542, 135 L.Ed.2d 1064 (1996).

On remand, we have limited our consideration to the effect of *Bush* and *Shaw II* on our previous analysis and holding. We have not considered any new evidence; we therefore readopt our previous factual findings, as outlined in the vacated opinion, to the extent that they are findings of fact and not conclusions of law regarding the "predominant factor" analysis, and to the extent that they are relevant to the threshold analysis. Specifically, we readopt ¶¶ 2, 3, and 5–10. *See* 912 F.Supp. at 1023–25. As to ¶ 11, we readopt the description of Tilling's notes and the finding that they are "probative" of the defendants' consideration of race, but we do not adopt the characterization of that consideration as "predominant" under the now-relevant Supreme Court standards. We need not readopt our previous findings of fact or conclusions of law as to the analysis under strict scrutiny, in which we held that the defendants did not have a compelling state interest to justify race-based redistricting. *See* 912 F.Supp. at 1027–30 (¶¶ 15–22). We see nothing in *Bush* or *Shaw II* that would change our previous analysis of compelling interest, but our holding that strict scrutiny is not applicable to the plan renders the compelling interest analysis unnecessary.

## II. STANDING

■ Although we did not previously address the plaintiffs' standing to challenge the apportionment plan or certain districts, the Supreme Court's clear and limited definition of standing in *Shaw II* prompts us to consider not only whether the plaintiffs have standing, but also the scope of that standing. Federal courts have "an independent obligation to examine their own jurisdiction, and

standing 'is perhaps the most important of [the jurisdictional] doctrines.' " *United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) (citations omitted)) (alteration in original).

The Supreme Court's treatment of standing in *Shaw* claim cases has not been entirely consistent. *Shaw I* itself appeared to be based on broadly conceptualized harms, focusing on the stigmatization of individuals because of their race and on potential "representational harms" resulting from representation only of members of the majority racial group in a district.[1] *See Hays*, 515 U.S. at 744–45, 115 S.Ct. at 2436; *Shaw I*, 509 U.S. at 643, 648, 113 S.Ct. at 2824–25, 2827; Mark S. Nagel, Recent Developments, 19 HARV.J.L. & PUB. POL'Y 188, 196 (1995). *See also* Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election–District Appearances After* Shaw v. Reno, 92 MICH. L.REV. 483, 515–16 (1993) (commenting on "just how nonindividualized . . . the expressive harm central to *Shaw* " was, and noting the Court's failure in *Shaw I* to address issues of standing); Pamela S. Karlan, *Still Hazy After All These Years: Voting Rights in the Post–Shaw Era*, 26 CUMB.L.REV. 287, 290 (1995–1996) (noting *Shaw's* " 'complete disregard for standing requirements' ") (citation omitted); Jeffrey L. Fisher, Note, *The Unwelcome Judicial Obligation to Respect Politics in Racial Gerrymandering Remedies*, 95 MICH.L.REV. 1404, 1416 (1997) ("[S]uch a speculative view of harm [as *Shaw*'s representational harm], however, has never been enough to satisfy Article III's standing requirement."). In *Hays*, the Court

rejected the argument that "anybody in the State" could challenge an allegedly racially gerrymandered district, holding instead that a plaintiff who does not reside in the challenged district must present "specific evidence" that he or she "has personally been subjected to a racial classification." 515 U.S. at 745, 115 S.Ct. at 2436. The Court explained that "[v]oters in [racially gerrymandered] districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms. . . ." *Id.*

In another decision issued on the same day as *Hays*, however, the Court appeared to focus not on the representational harms to the white plaintiffs who challenged a majority-minority district, but on the general, expressive harms that result from government use of racial classifications. *See Miller v. Johnson*, 515 U.S. 900, 911–13, 115 S.Ct. 2475, 2486, 132 L.Ed.2d 762 (1995) (emphasizing the offensiveness of such use); *see also* Karlan, *supra*, at 288 (commenting on *"Miller*'s apparent abandonment of any requirement that plaintiffs prove 'representational harms.' ").

In *Shaw II*, the *Shaw I* suit that spawned this line of cases returned to the Supreme Court, which then applied the *Hays* rule and cemented the test of standing to bring a *Shaw* claim: a plaintiff who resides in a particular district has standing to challenge the legislation that created that district; a plaintiff from outside the district does not have standing to challenge the legislation without specific evidence that he or she "personally has been subjected to a racial classification." 517 U.S. at ——, 116 S.Ct. at

---

**1.** The message that [racially gerrymandered] districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole.

*Shaw I*, 509 U.S. at 648, 113 S.Ct. at 2827. But this conception of harm arguably is based on an assumption that *Shaw I* rejected:

Although the *Shaw* Court attributed representational harms solely to a message sent by the legislature's action, those harms can only come

about if the message is received—that is, first, if all or most black voters support the same candidate, and, second, if the successful candidate ignores the interests of her white constituents. Respondents' standing, in other words, ultimately depends on the very premise the Court purports to abhor: that voters of a particular race " 'think alike, share the same political interests, and will prefer the same candidates at the polls.' "

*Miller v. Johnson*, 515 U.S. 900, 927–29, 115 S.Ct. 2475, 2497–98, 132 L.Ed.2d 762 (1995) (Stevens, J., dissenting) (quoting *Miller* majority, 515 U.S. at 911–12, 115 S.Ct. at 2486 (quoting *Shaw I*, 509 U.S. at 647, 113 S.Ct. at 2826–27)).

1900. The scope of the standing is specific— the plaintiff's challenge is limited to the particular district on which standing is based:

> Two appellants, Ruth Shaw and Melvin Shimm, live in District 12 and thus have standing to challenge that part of Chapter 7 which defines District 12. The remaining appellants do not reside in District 1 [the other challenged district], however, and they have not provided specific evidence that they personally were assigned to their voting districts on the basis of race. Therefore, we conclude that only Shaw and Shimm have standing and only with respect to District 12.

*Id.* (citation and footnote omitted).[2]

■ In the present case, the plaintiffs have purported to challenge the Ohio Appor-

tionment Board's plan as a whole; the previous, vacated opinion of this court held eight specific districts unconstitutional: House Districts ("HD") 21, 22, 30, 31, 38, 39, 44, and 49. The defendants concede that at least one plaintiff resides in HD 31, HD 39, HD 44, and HD 49, and challenge plaintiffs' standing only as to HD 21, HD 22, HD 30, and HD 38. The plaintiffs have not presented specific evidence that any of them have personally been subjected to a racial classification in relation to these latter four districts, and they do not argue that basis for standing. Instead, they attempt to base their standing on alternative grounds which we hold are meritless.

■ First, the plaintiffs contend that the plaintiffs who were members of the Appor-

---

2. Although the plaintiffs in the instant case concede, as they must, that the Supreme Court's clear enunciation of the standing rule in *Shaw II* is binding upon this court, they contend that the restriction of the scope of the challenge (i.e., a plaintiff has standing only to challenge the particular district on which standing is grounded) did not follow from *Hays* or *Miller*. We note, however, that neither of those cases presented this question clearly; neither case featured plaintiffs who resided in an allegedly gerrymandered district and who sought to challenge a districting plan as a whole. In *Hays*, the plaintiffs challenged Louisiana's districting legislation in its entirety, but the Court based its holding that they did not have standing on the fact that no plaintiff resided in the particular district they alleged had been racially gerrymandered; the opinion did not address whether a plaintiff who did reside in that district would have standing to challenge the entire state plan. 515 U.S. at 746, 115 S.Ct. at 2437. In *Miller*, on the other hand, the plaintiffs challenged Georgia's Eleventh (congressional) District; all of the plaintiffs resided in that district and therefore had standing to challenge it.

Some commentators have suggested that the Supreme Court's development of standing in this area is conceptually flawed for a variety of reasons, including that a shift in emphasis from representational harms to expressive harms arguably undermines the justification for residence-based standing. *See, e.g.*, Nagel, *supra*, at 196 ("As announced in *Hays* and applied in *Miller*, the standing requirements for a *Shaw* claim are satisfied by a general allegation of state wrongdoing, without any showing of personal injuries and unsubstantiated by any evidence.") (footnote omitted). *See also* Karlan, *supra*, at 292 ("Despite its surface plausibility in limiting standing to voters within a challenged district, *Hays* rested on a series of illogical and constitutionally unacceptable premises.... [I]t is simply wrong to suppose that all individuals within a

challenged district have suffered a racial classification."); *id.* at 296–97 ("The Court's nonchalance about standing conveys a central point about the wrongful districting cases: they really aren't individual rights lawsuits in the first place. Rather they concern the meaning of 'our system of representative democracy.'") (footnote omitted); Jack Pritchard, Casenote, United States v. Hays: *A Winnowing of Standing to Sue in Racial Gerrymandering Claims*, 47 MERCER L.REV. 955, 964 (1996) ("[T]here is no real difference between residents and nonresidents in reference to racially gerrymandered districts.... Those who reside outside the gerrymandered district may be harmed in the same manner and receive the same injuries as those who are residents of that district.") (footnotes omitted); Samuel Issacharoff & Thomas C. Goldstein, *Identifying the Harm in Racial Gerrymandering Claims*, 1 MICH.J. RACE & L. 47, 64 (1996):

> As the modern Court has noted, the racial gerrymandering cases resemble *Gomillion* in that the government drew boundary lines in order to include only a certain racial proportion. But in *Hays*, Justice O'Connor concluded that only the citizens within a district were presumptively injured, not those that were excluded, which is to say that the Whites in Tuskegee could sue but not the excluded Blacks. That reasoning simply fails to recognize that, in districting, a decision to include one kind of person is fundamentally also a decision to exclude other kinds of people.

(internal citation omitted) (referring to *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), in which the Court invalidated the State of Alabama's redrawing of the boundaries of Tuskegee, which excluded ninety-six percent of the city's black residents and almost no whites).

Regardless of its possible conceptual problems, however, we are bound by the Supreme Court's rule on standing in *Shaw* cases.

tionment Board have standing as a result of "being unable to fulfill their duty to create legal voting districts"—i.e., legislator standing. Pls.' Mem. at 12. *See, e.g., Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974). A recent decision of the Supreme Court, however, suggests that legislator standing based on institutional injury, under *Coleman,* is limited to instances of vote nullification with regard to a specific legislative action. *Raines v. Byrd,* —— U.S. ——, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Moreover, rather than an improper procedure (as in *Coleman* and *Moore* ) or an incursion by another branch of government (as in *Kennedy* ), the plaintiffs' alleged injury in this case resulted from the majority's decision to choose a course of action that the outnumbered members thought to be unconstitutional. *Cf. Raines,* —— U.S. at ——, 117 S.Ct. at 2320 ("In the vote on the Line Item Veto Act, their votes were given full effect. They simply lost that vote."). Not only is the substance of the claimed injury distinguishable, but the precedent of granting the plaintiffs standing in this context would invite any legislator who was outvoted on a particular measure to bring a constitutional challenge to that measure merely because he or she had not prevailed. *Cf. Raines,* —— U.S. at ——, 117 S.Ct. at 2323 (Souter, J., concurring in the judgment) ("[H]arm to the[ ] interest in having government abide by the Constitution ... would be shared to the same extent by the public at large and thus provide no basis for suit....") (citations omitted).

■ Second, the Board member plaintiffs contend that they have standing under the doctrine of *jus tertii.* Pls.' Mem. at 13. This argument also fails, because the justification for third-party standing is not present here. Generally speaking, a plaintiff is permitted to assert the rights of a third party where the plaintiff has suffered his or her own injury-in-fact, there is a nexus between the right asserted and the relationship between the party and the third party, and the

litigation will have a material impact on those third-party interests. *See generally United States Department of Labor v. Triplett,* 494 U.S. 715, 720–21, 110 S.Ct. 1428, 1431–32, 108 L.Ed.2d 701 (1990); *Caplin & Drysdale v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528 (1989); *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–34, 31 L.Ed.2d 349 (1972). In this case, there is no "special" relationship between the Board members and the voters of Ohio that is comparable to the direct relationships between doctors and patients or lawyers and clients, or even vendors and customers (*see Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–57, 50 L.Ed.2d 397 (1976)). Any relationship between Board members and voters is too vague and general—and the defendants include the other Board members, who presumably have the same relationship with the voters, rather than some external entity that is impinging upon the asserted relationship. Furthermore, there is no obstacle to prevent the third parties from bringing their own claims; the question presented here could be raised by any voter from one of the contested districts.

■ In the alternative, plaintiffs request that this court "proceed to certify this action as a class action with respect to a subclass of voters who reside in the eight districts [at issue]." Pls.' Mem. at 14. The plaintiffs make no attempt to show that they can meet the prerequisites stated in FED.R.CIV.P. 23(a). Given the Supreme Court's emphasis on treating each district individually, particularly with respect to standing, plaintiffs cannot demonstrate sufficient typicality of their claims. FED.R.CIV.P. 23(a)(3). We cannot subvert the Supreme Court's clear standing requirements by certifying a class to represent HD 21, HD 22, HD 30, and HD 38, when the plaintiffs do not allege that any current plaintiff individually could represent any of those districts.

We therefore hold that the plaintiffs have standing to challenge only HD 31, HD 39, HD 44, and HD 49.

## III. THE *SHAW* CLAIM

### A. The Application of Strict Scrutiny to Race–Based Districting

#### 1. *Shaw v. Reno (Shaw I )*

The Supreme Court first recognized a cause of action under equal protection based on race-based districting in *Shaw I*. In that case, the Court held that the plaintiffs had stated a cognizable claim by alleging that reapportionment legislation, "though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." 509 U.S. at 649, 113 S.Ct. at 2827. Such a claim was "analytically distinct" from a claim of vote dilution. *Id.* at 652, 113 S.Ct. at 2830.[3]

The Court did not, however, hold that strict scrutiny is necessarily triggered by governmental use of race:

> It is unnecessary for us to decide whether or how a reapportionment plan that, on its face, can be explained in nonracial terms successfully could be challenged. Thus, we express no view as to whether "the intentional creation of majority-minority districts, without more," always gives rise to an equal-protection claim.

509 U.S. at 649, 113 S.Ct. at 2828. The Court nevertheless discussed how race-based redistricting might be shown; here, the Court acknowledged the fact of race-consciousness in the redistricting process, and suggested the role of traditional districting practices in avoiding strict scrutiny:

> [R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political per-

suasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination. . . .

> . . . [Proof of a "racial gerrymander" could be made by showing that] a State concentrated a dispersed minority population in a single district by *disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions.* We emphasize that these criteria are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines.

*Id.* at 646–47, 113 S.Ct. at 2827–28 (internal citation omitted) (second emphasis added). *See also id.* at 642, 113 S.Ct. at 2824 (characterizing the appellants' complaint as objecting to "redistricting legislation that is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, *without regard for traditional districting principles* and without sufficiently compelling justification.") (emphasis added).[4]

#### 2. *Miller v. Johnson*

Two years after *Shaw I*, the Court clarified the test for applying strict scrutiny to redistricting legislation, articulating the threshold that the Court has continued to apply. In *Miller,* the Court explained that bizarreness of a district's shape was not a prerequisite for strict scrutiny; rather, it was one type of evidence that a drawing of the district had been motivated by race. Bizarreness of shape "may be persuasive circumstantial evidence that race for its own sake, and *not other districting principles,*

---

3. *Shaw* recognized a claim "analytically distinct" from a vote dilution claim. Whereas a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device "to minimize or cancel out the voting potential of racial or ethnic minorities," an action disadvantaging voters of a particular race, the essence of the equal protection claim recognized in *Shaw* is that the State has used race as a basis for separating voters into districts.
*Miller,* 515 U.S. at 908–12, 115 S.Ct. at 2485–86.

4. It is worth noting that *Shaw I* involved a challenge to an oddly shaped district, where the

shape of the district was itself the alleged objective evidence of racial discrimination. In the present case, on the other hand, the shapes of the challenged districts are unremarkable, but the defendants admittedly considered race in drawing the districts. For that reason, *Shaw I* is not directly on point; we discuss it in some detail because it makes clear that traditional districting principles have played a significant role in the application of strict scrutiny since the conception of the *Shaw* claim.

was the legislature's *dominant and controlling rationale* in drawing its district lines." 515 U.S. at 911–12, 115 S.Ct. at 2486 (emphases added). The Court went on to enunciate the threshold showing required of a *Shaw* plaintiff:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the *predominant factor* motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing, a plaintiff must prove that the legislature *subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests, to racial considerations.* Where these or other race-neutral considerations are the basis for redistricting legislation, and are not subordinated to race, a state can "defeat a claim that a district has been gerrymandered on racial lines." These principles inform the plaintiff's burden of proof at trial.

*Id.* at 915–16, 115 S.Ct. at 2488 (quoting *Shaw I,* 509 U.S. at 647, 113 S.Ct. at 2826–27) (emphases added) (internal citation omitted). *See also id.* at 917–18, 115 S.Ct. at 2489 ("Although a legislature's compliance with 'traditional districting principles ...' may well suffice to refute a claim of racial gerrymandering, appellants cannot make such a refutation where, as here, those factors were subordinated to racial objectives.") (internal citation omitted).

Justice O'Connor joined the opinion of the Court, but also wrote a separate concurring opinion [5]:

I understand the threshold standard the Court adopts—"that the legislature subordinated traditional race-neutral districting principles ... to racial considerations[ ]"—to be a *demanding* one. To invoke strict scrutiny, a plaintiff must show that the State has relied on race in *substantial disregard* of customary and traditional districting practices. Those practices provide a crucial frame of reference and therefore constitute a significant governing principle in cases of this kind....

... [A]pplication of the Court's standard helps achieve *Shaw*'s basic objective of making *extreme instances* of gerrymandering subject to meaningful judicial review. 515 U.S. at 928–29, 115 S.Ct. at 2497 (O'Connor, J., concurring) (emphases added) (first ellipsis in original) (internal citation omitted).

Justice O'Connor's perception of the threshold standard as a demanding test was not shared by Justice Ginsburg, who warned that the decision in *Miller* "open[ed] the way for federal litigation if 'traditional ... districting principles' *arguably were accorded less weight* than race." 515 U.S. at 949, 115 S.Ct. at 2507 (Ginsburg, J., dissenting) (emphasis added). The previous opinion of this court incorporated Justice Ginsburg's characterization of the *Miller* standard into its statement of the applicable threshold. *See Quilter,* 912 F.Supp. at 1026, 1027. The additional guidance of *Shaw II* and *Bush,* the clearer importance of Justice O'Connor's position, and her further elucidation of her views in a separate concurrence in *Bush, see infra,* however, make clear that the "predominant factor"/"subordination" test requires more than a showing that traditional districting principles "were accorded less weight than race."

---

**5.** We pay particular attention to Justice O'Connor's views in this area because she has played an important role in every case relevant to the threshold analysis. She authored the majority opinion in *Shaw I* and the plurality opinion in *Bush,* and she provided the deciding vote in *Miller* and *Shaw II.* Her concurring opinions in *Miller* and *Bush* shed significant light on her views of the role of strict scrutiny and of the height of the threshold. Given Justice O'Connor's pivotal role in *Shaw* claim cases, those separate opinions carry special weight. *See, e.g.,* Issacharoff & Goldstein, *supra,* at 60 (noting that Justice O'Connor provided "the indispensable

fifth vote" in *Miller,* and stating that her separate concurrence "is widely viewed as an important limit on *Miller*'s scope."); *id.* at 50 ("Justice O'Connor [ ] agrees that racial classifications carry dangers, but differs from the others on both the precise degree of racial motivation that causes harm and just what that harm is."); David M. Guinn & Paul C. Sewell, Miller v. Johnson: *Redistricting and the Elusive Search for a Safe Harbor,* 47 Baylor L. Rev. 895,904–06 (1995) (discussing Justice O'Connor's concurrence in *Miller* and predicting that her views in the then-pending *Shaw II* and *Bush* cases "may be dispositive").

### 3. *Shaw v. Hunt (Shaw II)*

Two cases decided on the same day, one year after *Hays* and *Miller*, further delineated the threshold analysis, particularly with regard to the role of traditional districting principles. The first was *Shaw II*, in which the five-member majority held that compliance with traditional districting principles does not necessarily shield a state from an equal protection attack. In his dissent, Justice Stevens stated that the Court's previous opinions had established that "race-based districting which respects traditional districting principles does not give rise to constitutional suspicion," and that "States may avoid strict scrutiny by complying with traditional districting principles." 517 U.S. at ——, ——, 116 S.Ct. at 1913, 1914 (Stevens, J., dissenting). The majority, however, rejected Justice Stevens's view, emphasizing that the focus of the inquiry was whether race had been the predominant consideration, even if traditional principles were involved. 517 U.S. at —— & n. 3, 116 S.Ct. at 1901 & n. 3. The Court held that although two race-neutral, traditional criteria had been at work in the drawing of the North Carolina district at issue, "[t]hat the legislature addressed these interests does not in any way refute the fact that race was the legislature's predominant consideration. *Race was the criterion that, in the State's view, could not be compromised.* ... [Traditional districting criteria] *came into play only after the race-based decision had been made.*" *Id.* at ——, 116 S.Ct. at 1901 (emphases added).

### 4. *Bush v. Vera*

Finally, the opinions of a fragmented Court in *Bush,* decided on the same day as *Shaw II,* shed light on the individual views of the various justices; as we noted above, Justice O'Connor's opinions for the plurality and for herself separately are especially valuable in guiding our application of the threshold analysis. Writing for a three-judge plurality,[6] Justice O'Connor stated:

[The findings of the District Court] that the State *substantially neglected* traditional districting criteria such as compactness, that it was committed from the outset to creating majority-minority districts, and that it manipulated district lines to exploit unprecedentedly detailed racial data [ ] together weigh in favor of the application of strict scrutiny. We do not hold that any one of these factors is independently sufficient to require strict scrutiny. The Constitution does not mandate regularity of district shape, and *the neglect of traditional districting criteria is merely necessary, not sufficient. For strict scrutiny to apply, traditional districting criteria must be subordinated to race* .... [T]he direct evidence of racial considerations, coupled with the fact that the computer program used [in redistricting] was significantly more sophisticated with respect to race than with respect to other demographic data, provides substantial evidence that it was race that led to the neglect of traditional districting criteria here. We must therefore consider what role other factors played in order to determine whether race predominated.

Several factors other than race were at work in the drawing of the districts. Traditional districting criteria were not *entirely* neglected....

Strict scrutiny would not be appropriate if race-neutral, traditional districting considerations predominated over racial ones.... Because it is clear that race was not the only factor that motivated the legislature to draw irregular district lines, we must *scrutinize each challenged district* to determine whether the District Court's conclusion that race predominated over legitimate districting considerations, including incumbency, can be sustained.

517 U.S. at ——–——, 116 S.Ct. at 1953–54 (first, second, and fifth emphases added) (internal citations omitted). In addition, the

---

6. Chief Justice Rehnquist and Justice Kennedy joined the plurality opinion, though Justice Kennedy wrote separately to disavow certain language in that opinion. *See* 517 U.S. at ——, 116 S.Ct. at 1971 ("[T]he statements in Part II of the opinion that strict scrutiny would not apply to all cases of intentional creation of majority-minority

districts ... are unnecessary to our decision, for strict scrutiny applies here. I do not consider these dicta to commit me to any position on the question....") (Kennedy, J., concurring). Justices Scalia and Thomas concurred in the judgment with a separate opinion authored by Justice Thomas. 517 U.S. at ——, 116 S.Ct. at 1972.

**1042**

plurality opinion stated that "[i]f, as may commonly happen, traditional districting principles are substantially followed without much conscious thought, they cannot be said to have been 'subordinated to race.'" *Id.* at ——, 116 S.Ct. at 1955.[7] The opinion noted, however, that the state appellants did not deny that a challenged district showed "substantial disregard" for the principles of compactness and regularity, or that "the redistricters pursued unwaveringly" the goal of creating a majority-minority district. *Id.* The Court upheld the district court's finding that traditional principles had been subordinated to race, so strict scrutiny applied.

In her separate concurring opinion, Justice O'Connor expressed her belief that *Shaw II* and *Bush* "present a workable framework" for reconciling the goals of the Voting Rights Act of 1965, 79 Stat. 437 (codified as amended at 42 U.S.C. § 1973 *et seq.*) ("VRA"), and the Fourteenth Amendment. 517 U.S. at ——, 116 S.Ct. at 1969 (O'Connor, J., concurring). She then once again rephrased the threshold for strict scrutiny:

> [S]o long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny. *Only if traditional districting criteria are neglected and that neglect is predominantly due to the misuse of race does strict scrutiny apply.*

*Id.* (some emphasis added) (internal citations omitted).

## B. Policy Considerations

The development of the *Shaw* line of cases has raised the specter of tension between two distinct areas of voting rights law, potentially placing states in an impossible position; if strict scrutiny of districting plans were easily triggered, states might be threatened on one side by potential litigation under the VRA for failure to create majority-minority districts, and on the other side by potential litigation under the Equal Protection Clause for using race in drawing districts. *See, e.g., Bush,* 517 U.S. at ——, 116 S.Ct. at 1968 (O'Connor, J., concurring) (referring to states' and lower courts' "toil[ing] with the twin demands of the Fourteenth Amendment and the Voting Rights Act"). *See also* Karlan, *supra,* at 289 ("States now find themselves walking a tightrope: if they draw majority-black districts they face lawsuits under the equal protection clause; if they do not, they face both objections under section 5 of the Voting Rights Act and lawsuits under section 2.") (footnotes omitted); Guinn & Sewell, *supra,* at 910 ("The dilemma essentially is whether a state must entertain for [§ 2] purposes a district which, if drawn, would force strict scrutiny."); Laughlin McDonald, Essay, *Can Minority Voting Rights Survive Miller v. Johnson,* 1 MICH.J.RACE & L. 119, 147–50 (1996). Nearly every plan would be challenged either because the districters considered race or because they did not, and nearly every plan would be subject to review by a federal court.

Although a districting plan might survive strict scrutiny, it could do so only if a federal

**7.** We do not believe that this statement conflicts with the Court's holding in *Shaw II* that compliance with traditional districting principles does not necessarily preclude strict scrutiny. The threshold inquiry examines the priorities of the state actors—i.e., race was the first consideration (the one that "could not be compromised," *Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1901), and traditional principles "came into play only *after* the race-based decision had been made," 517 U.S. at ——, 116 S.Ct. at 1901 (emphasis added), then strict scrutiny is triggered; if, on the other hand, traditional principles were followed first ("without much conscious thought"), and then racial considerations were fit into that framework, the threshold is not met. *See, e.g., DeWitt v. Wilson,* 856 F.Supp. 1409, 1413 (E.D.Cal. 1994) ("[I]n redistricting, consciousness of race does not give rise to a claim of racial gerrymandering when race is considered along with tradi-

tional redistricting principles ...."), *summarily aff'd. mem.,* 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). *See also Abrams v. Johnson,* —— U.S. ——, ——, 117 S.Ct. 1925, 1934, 138 L.Ed.2d 285 (1997) (upholding a district court's judgment drawing a plan with one majority-black district, rather than two, where the court had considered "that a black voting population was one factor in drawing a district," but had concluded that retaining a second majority-black district would require that one factor to predominate over traditional districting principles).

We emphasize that we use the word "first" in reference to prioritization, not to suggest a chronological process; we similarly interpret the Supreme Court's use of "after." A literal chronological reading would substitute an overly formalistic approach in place of the Court's "predominant factor" analysis.

court held that the state did indeed have a compelling interest to justify considering race and that the districting plan chosen by the state was narrowly tailored to serve that interest. *Bush*, 517 U.S. at ——, 116 S.Ct. at 1960; *Shaw II*, 517 U.S. at ——, 116 S.Ct. at 1902; *Miller*, 515 U.S. at 919–21, 115 S.Ct. at 2490. A plan subjected to strict scrutiny would be saved from unconstitutionality only if the state was "right."[8] As a result, litigation would be virtually inevitable; any consideration of race in redistricting would be tested in the courts. Justice Ginsburg raised precisely this concern in *Miller*:

> The Court's disposition renders redistricting perilous work for state legislatures. Statutory mandates and political realities may require States to consider race when drawing district lines. But today's decision is a counterforce; it opens the way for federal litigation if 'traditional ... districting principles' arguably were accorded less weight than race....
>
> Only after litigation—under either the Voting Rights Act, the Court's new *Miller* standard, or both—will States now be assured that plans conscious of race are safe. Federal judges in large numbers may be drawn into the fray. This enlargement of the judicial role is unwarranted.

515 U.S. at 949, 115 S.Ct. at 2507 (internal citation omitted). *See also Abrams v. Johnson*, —— U.S. ——, —— – ——, 117 S.Ct. 1925, 1949–50, 138 L.Ed.2d 285 (1997) (Breyer, J., dissenting) (warning of legislators' difficulty in discerning what the predominant factor test means, and of "the risk of significant judicial entanglement in the inherently political redistricting process").

Justice O'Connor also has noted the tension. *See Bush*, 517 U.S. at ——, 116 S.Ct. at 1970 (O'Connor, J., concurring):

> [T]he application of the principles that I have outlined sometimes requires difficult exercises of judgment. That difficulty is inevitable. The Voting Rights Act requires the States and the courts to take action to remedy the reality of racial in-

equality in our political system, sometimes necessitating race-based action, while the Fourteenth Amendment requires us to look with suspicion on the excessive use of racial considerations by the government. *But see id.* at ——, 116 S.Ct. at 1968 (stating her view that the results test of VRA § 2 "can co-exist in principle and in practice with *Shaw v. Reno* "). Recognizing the precarious position in which these "twin" constraints place states, *id.* Justice O'Connor has accordingly sought to interpret the threshold as "demanding" and applicable only in "extreme" cases. *See Miller*, 515 U.S. at 928–29, 115 S.Ct. at 2497 (O'Connor, J., concurring).

In addition to the "tightrope" that the VRA and *Shaw* force states to walk, it is worth noting that a state cannot be entirely certain of surviving strict scrutiny, even if it believes that its consideration of race is necessary to avoid § 2 liability and that its plan is narrowly tailored to avoid such liability. Although at least five members of the Court appear to have suggested that compliance with § 2 of the VRA can be a compelling interest for purposes of strict scrutiny, the Court itself has not yet so held. *See, e.g., Miller*, 515 U.S. at 921, 115 S.Ct. at 2490–91 (stating that "[w]hether or not in some cases compliance with the Voting Rights Act, standing alone, can provide a compelling interest independent of any interest in remedying past discrimination, it cannot do so here [because the challenged plan was not required by the VRA]".); *Shaw II*, 517 U.S. at ——, 116 S.Ct. at 1903 ("Here once again we do not reach that question [reserved in *Miller* ]" because the challenged district was not required by VRA § 5 and was "not a remedy narrowly tailored to the State's professed interest in avoiding § 2 liability"); *Bush*, 517 U.S. at ——, 116 S.Ct. at 1960 ("As we have done in each of our previous cases in which this argument has been raised as a defense to charges of racial gerrymandering, we assume without deciding that compliance with [§ 2] ... can be a compelling state inter-

---

8. For example, the defendants in the present case contended that they believed that avoidance of liability under § 2 of the VRA required them to consider race in drawing the challenged districts; this court, however, held that the plan failed strict scrutiny because the defendants did

not have a strong basis in evidence for that belief, since the evidence established that white bloc-voting (which is required to prove a § 2 claim) did not exist in Ohio. *See Quilter*, 912 F.Supp. at 1028–29. In other words, the court found that the defendants were not "right."

est."); *Abrams,* —— U.S. at ——, 117 S.Ct. at 1936 (again assuming without deciding). *But see Bush,* 517 U.S. at —— – ——, 116 S.Ct. at 1968–70 (O'Connor, J., concurring) (stating that § 2 can satisfy the compelling interest prong of strict scrutiny) *id.* at ——, 116 S.Ct. at 1989 (Stevens, J., dissenting, joined by Ginsburg, J., and Breyer, J. (see *id.* at ——, 116 S.Ct. at 1974)) (appearing to agree); *id.* at ——, 116 S.Ct. at 2007 (Souter, J., dissenting, joined by Ginsburg, J., and Breyer, J.) (same).

■ As we apply the threshold analysis developed by the Supreme Court in *Shaw* cases, we are mindful of the dangers that a low threshold (easily invoking strict scrutiny) poses for states. We therefore follow Justice O'Connor's lead in applying a demanding threshold that allows states some degree of latitude to consider race in drawing districts. While adherence to traditional districting principles does not automatically create a "safe harbor" from strict scrutiny, we will not apply strict scrutiny without the "necessary" showing by the plaintiffs that the defendants neglected traditional districting criteria and that that neglect is predominantly due to the misuse of race.

### C. Traditional Districting Principles

■ As a preliminary step, it is necessary to define "traditional districting principles" as that concept is repeatedly emphasized in the *Shaw* line of cases. In general, traditional criteria include "compactness, contiguity, and respect for political subdivisions." *Shaw*

*I,* 509 U.S. at 647, 113 S.Ct. at 2826; *see also Reynolds v. Sims* 377 U.S. 533, 578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964) (holding that a "desire to maintain the integrity of various political subdivisions" and to "provide for compact districts of contiguous territory" are legitimate state interests in apportionment); *Karcher v. Daggett,* 462 U.S. 725, 756 n. 18, 103 S.Ct. 2653, 2673 n. 18, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (noting that, as of 1981, one state statute and twenty-one state constitutions required compactness, and that two state statutes and twenty-seven constitutions required contiguity). The *Shaw* claim cases have repeatedly cited these criteria as traditional. *See, e.g., Miller,* 515 U.S. at 915–16, 115 S.Ct. at 2488 (defining "traditional race-neutral districting principles" as "including but not limited to compactness, contiguity, [and] respect for political subdivisions or communities defined by actual shared interests"); *Bush,* 517 U.S. at —— – ——, 116 S.Ct. at 1953–54 (citing as evidence that "[t]raditional districting criteria were not *entirely* neglected" the maintenance of the integrity of county lines, the grouping of principal cities with their surrounding urban areas, the prevalence of incumbency protection, and the preservation of communities of interest (as determined by evidence other than racial data)).

■ The State of Ohio has established districting criteria to be followed, including the customary principles discussed above, in Article XI of the Ohio Constitution.[9] Many states have codified traditional districting cri-

---

9. The relevant provisions of Article XI are as follows (in the interest of brevity, we paraphrase where possible):

§ 2: The whole population of the state, as determined by the federal decennial census, shall be divided by ninety-nine to determine the ratio of house representation, and by thirty-three to determine the ratio of senate representation.

§ 3: The population of each house district shall be substantially equal to the ratio of house representation determined by § 2, and "in no event" shall any house district contain a population of less than ninety-five percent or more than 105 percent of that ratio, except "where reasonable effort is made to avoid dividing a county in accordance with section 9 . . . ."

§ 4: The population of each senate district shall be substantially equal to the ratio of senate representation determined by § 2, and "in no event" shall any senate district contain a popula-

tion of less than ninety-five percent or more than 105 percent of that ratio.

§ 6: District boundaries shall not be changed until the next census, notwithstanding changes in boundaries of political subdivisions or city wards. District boundaries shall be created by using the boundaries of political subdivisions and city wards as they exist at the time of the census on which the apportionment is based, "or such other basis as the general assembly has directed."

§ 7: Captioned "Compact House districts composed of contiguous territory"

(A): Every house district "shall be compact and composed of contiguous territory, and the boundary of each district shall be a single nonintersecting continuous line. To the extent consistent with the requirements of [§ 3] . . . the boundary lines of districts shall be so drawn as to delineate an area containing one or more whole counties."

teria, either in statutes or in constitutions. *See Karcher,* cited above. Ohio, however, appears to have prescribed more extensive and specific criteria than any other state. *See* Transcript of Trial Proceedings, Part 1 (November 16, 1994), R. 311, at 74–75 (testimony of Gordon Henderson, expert witness for the plaintiffs, to the effect that the detail of Ohio's apportionment rules is unusual). Because Ohio has chosen to establish such detailed criteria and to constitutionalize them, the defendants argue that this court should abstain from reaching the issue of compliance with traditional districting principles, leaving it instead to the Ohio Supreme Court. The constitutionalization of districting criteria, however, does not preclude a federal court from applying the threshold analysis developed in the *Shaw* claim cases. If it did, Ohio, unlike other states, would be effectively immune from federal court review of its apportionment plans under *Shaw,* on grounds of abstention; moreover, any other state would be able to shield itself from *Shaw* challenges by similarly codifying or constitutionalizing its districting procedures. Such a result is untenable.

We reject the defendants' argument that we cannot address the question of their attention to or disregard of Article XI of the Ohio Constitution, at least to the extent that the state constitutional requirements coincide with the traditional criteria recognized by the United States Supreme Court.[10] The stan-

(B): "Where the requirements of [§ 3] ... cannot feasibly be attained by forming a district from a whole county or counties, such district shall be formed by combining the areas of governmental units giving preference in the order named to counties, townships, municipalities, and city wards."

(C): "Where the requirements of [§ 3] ... cannot feasibly be attained by combining the areas of governmental units as prescribed in division (B) of this section, only one such unit may be divided between two districts, giving preference in the selection of a unit for division to a township, a city ward, a city, and a village in the order named."

(D): "In making a new apportionment, district boundaries established by the preceding apportionment shall be adopted to the extent reasonably consistent with the requirements of [§ 3]...."

§ 8: "A county having at least one house ... ratio of representation shall have as many house ... districts wholly within the boundaries of the county as it has whole ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining house ... district."

"The number of whole ratios of representation for a county shall be determined by dividing the population of the county by the ratio of representation for the house of representatives determined under [§ 2]...."

§ 9: Where the population of a county is not less than ninety percent nor more than 110 percent of the house ratio, "reasonable effort shall be made to create a house ... district consisting of the whole county."

§ 10: "The standards prescribed in sections 3, 7, 8, and 9 of this Article shall govern the establishment of house of representatives districts, which shall be created and numbered in the following order to the extent that such order is consistent with the foregoing standards:"

(A): "Each county containing population substantially equal to one [house] ratio ... as provided in [§ 2], but in no event less than ninety-five per cent of the ratio nor more than [105] per cent of the ratio shall be designated a representative district."

(B): "Each county containing population between ninety and ninety-five per cent of the ratio or between one hundred five and [110] per cent of the ratio may be designated a representative district."

(C): "Proceeding in succession from the largest to the smallest, each remaining county containing more than one whole ratio of representation shall be divided into house ... districts. Any remaining territory in such county containing a fraction of one whole ratio of representation shall be included in one representative district by combining it with adjoining territory outside the county."

(D) "The remaining territory of the state shall be combined into representative districts."

§ 11: "Senate Districts shall be composed of three contiguous house of representatives districts. A county having at least one whole senate ratio of representation shall have as many senate districts wholly within the boundaries of the county as it has whole senate ratios of representation. Any fraction of the population in excess of a whole ratio shall be a part of only one adjoining senate district. Counties having less than one senate ratio of representation, but at least one house of representatives ratio of representation shall be part of only one senate district."

"The number of whole ratios of representation for a county shall be determined by dividing the population of the county by the ratio of representation in the senate determined under section 2 of this Article."

**10.** We recognize that the Supreme Court cases to date have not addressed the role of codified or constitutionalized districting principles where those principles *do not coincide,* and perhaps

dard articulated by the Supreme Court does not require us to find that the defendants violated a state constitutional provision, or alternatively, that the defendants complied with a state constitutional provision; rather, the focus of the inquiry under Supreme Court precedent is whether defendants appear to have considered race within the context of applying traditional districting principles, or to have shoved traditional criteria aside in order to achieve a particular race-based result—in other words, whether the defendants substantially followed the prescribed principles or flagrantly ignored them.

■ The defendants contend that this court is precluded from holding that they neglected or violated the criteria of Article XI of the Ohio Constitution by the decision of the Ohio Supreme Court in *Voinovich v. Ferguson,* 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992). The defendants argue that the

entire plan, and all the arguments against it, were before that court; they point to Justice Resnick's detailed dissent, in which she discussed the plan as a whole and applied §§ 3, 4, 7, 9, and 10. 63 Ohio St.3d at 214–30, 586 N.E.2d 1020. They then rely on vague language from the last line of the per curiam opinion, which stated that "we find the plan to be constitutional." *Id.* at 200, 586 N.E.2d 1020. The defendants contend that the Ohio Supreme Court considered the entire plan, and all the applicable provisions of Article XI, and declared the plan as a whole to be in compliance with the state constitution, precluding this court from finding otherwise.

The fractured opinions in *Voinovich,* however, contradict the defendants' position. First, the per curiam opinion, which four of seven justices joined, was just over half a page in length. It discussed only Senate District 32, and applied only OHIO CONST., art.

even conflict, with the general criteria identified by the Court. It is possible that the Court would choose to consider only the general criteria (as a federal conception of districting principles), to avoid becoming enmeshed in the specific requirements of the various states. In his dissent in *Shaw II,* Justice Stevens, disagreeing with the majority's conclusion that the noncompact appearance of District 12 in North Carolina suggested suspect race-based districting, noted that although the North Carolina Constitution required contiguity, it did not require compactness. 517 U.S. at ——, 116 S.Ct. at 1915. Justice Stevens further wrote that "[g]iven that numerous States have written geographical compactness requirements into their state constitutions, North Carolina's omission on this score is noteworthy.... It reveals that North Carolina's creation of a geographically noncompact district does not itself mark a deviation from any prevailing state districting principle." *Id.* (citation omitted). "Indeed, the State's guide to redistricting specifically informed state legislators that compactness was of little legal significance." *Id.* at n. 12. If Justice Stevens is correct that the state itself did not treat compactness as a traditional districting principle, and the Supreme Court judged a district in that state by its disregard of that "traditional" principle, then the Court may have chosen a generalized, as opposed to state-specific, approach to the threshold inquiry.

On the other hand, in a more recent decision the Court appeared to rely on state-specific criteria in upholding a district court's finding that traditional districting principles had not been subordinated to race. In *Lawyer v. Department of Justice,* —— U.S. ——, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997), the appellant challenged that finding, citing the challenged district's inclu-

sion of more than one county, its crossing a body of water, its irregular shape, and its noncompactness. The Court rejected the appellant's arguments, pointing to "unrefuted evidence showing that on each of these points District 21 is no different from what Florida's traditional districting principles could be expected to produce." *Lawyer,* —— U.S. at ——, 117 S.Ct. at 2195.

A generalized approach would have the advantage of not subjecting a state that has clearly prescribed its criteria to a more exacting standard, and a more searching inquiry, than a state that has not done so. The obvious flaw in that approach, however, is that the threshold analysis is designed to identify situations in which states have neglected the criteria they would otherwise consider in pursuit of race-based objectives; if courts measure a state's plan by reference to general criteria, without regard for the state's own criteria (those that it would otherwise consider), the inquiry may fail to serve its very purpose. On the other hand, if the Supreme Court applied state-specific criteria, the principles relevant to the analysis could vary widely from state to state, resulting in different standards for different states; even more significantly, a state might be able to protect itself from *Shaw* scrutiny by establishing minimal or vague criteria (or perhaps none at all), such that it could *never* be found to have neglected or subordinated those criteria to race.

For our purposes, this apparently open question is not dispositive. Because the provisions of OHIO CONST., art. XI generally coincide with the traditional criteria of compactness, contiguity, and respect for political subdivisions, we need not decide what criteria are relevant where the state principles differ.

XI, §§ 4, 9, and 11, holding that those three provisions are coequal and that when they conflict, the apportionment board has the discretion to choose which to follow. 63 Ohio St.3d at 200, 586 N.E.2d 1020. Almost every justice wrote separately, shedding light on what each justice thought the per curiam opinion did and did not hold. Chief Justice Moyer, in a concurring opinion, stated that he believed that the only justiciable issues presented by the plaintiffs in that case [11] were "the dispute regarding Senate District 32 and House District 68 and the inconsistency between Sections 3, 4, 8 and 11 of Article XI...." *Id.* at 201–02, 586 N.E.2d 1020. Justice Holmes, "concurring separately," would have held that the plan as a whole did not violate Article XI "and specifically Sections 7 and 10 thereof," and that House District 68 and Senate District 32 were constitutionally drawn under Article XI and did not violate Sections 3, 4, 8, or 11. *Id.* at 202–05, 586 N.E.2d 1020. Justice Douglas, concurring with the per curiam opinion, but "for different reasons than stated therein and with some reservations" (and with the agreement of Milligan, J.), narrowed the inquiry to Senate District 32 and to an apparent conflict between Sections 4 and 11. *Id.* at 205–14, 586 N.E.2d 1020.

Justice Resnick, in a lengthy dissent joined by Justice Brown, analyzed the entire plan under all of Article XI and found numerous state constitutional violations. 63 Ohio St.3d at 214–30, 586 N.E.2d 1020. Hers appears to be the only opinion that fully addressed the plaintiffs' request that the plan as a whole be declared in conformity in all respects with Article XI; ironically, she concluded otherwise, and would have ordered that the plan be redrawn. Justice Sweeney also dissented, believing that the parties did not have standing, but stating that assuming *arguendo* that they did, he would concur in Justice Resnick's analysis. *Id.* at 214, 586 N.E.2d 1020.

The only clear conclusion to be drawn from the state court's opinion is that it came to no clear conclusion as to the issues before this court. That opinion, therefore, neither precludes this court's consideration of the defendants' attention to traditional districting principles with regard to HD 31, HD 39, HD 44, and HD 49, nor mandates a particular finding by this court.

### D. The Threshold Inquiry

■ The burden is on the plaintiffs to make a showing that the defendants substantially disregarded or neglected traditional districting principles and that they did so predominantly due to use of racial considerations in drawing the challenged districts. *See supra* Part III.A. As this court previously found, the plaintiffs presented direct evidence that clearly showed that the defendants used racial considerations in drawing the districts. *See Quilter,* 912 F.Supp. at 1023–25. James R. Tilling drew the plan that formed the basis for the reapportionment plan ultimately adopted by the Board.[12] Tilling's handwritten notes documenting the process by which he began drawing the reapportionment plan indicate that, for each county containing a significant minority population, Tilling displayed the minority population of the county on the computer screen,

---

**11.** The plaintiffs in the state court case are the defendants in this case, the Apportionment Board majority members.

**12.** Robert T. Bennett, the chairman of the Ohio Republican Party, did submit a plan to the Board on behalf of the party, and made a statement at a Board hearing that was substantially similar to a letter attached to that plan stating that the plan sometimes departed from the Ohio Constitution's requirements in favor of Voting Rights Act considerations. *See* R. 154, Ex. 15, at 27; Defs.' Trial Ex. 79. We note, however, that the Republican Party plan submitted by Bennett, and on which he based his remarks, was one of five proposed apportionment plans submitted to the Board, and was rejected by the Board. *See* R. 154, Ex. 15, at 7–8 (Governor Voinovich, at a Board hearing, stated that seven plans had been submitted and one withdrawn); *id.* at 26–30 (Bennett introduced the Republican Party plan); R. 147, Ex. A, ¶¶ 13, 14 (listing five submitted plans and their sponsors); R. 147, Ex. B, at 24 (referring to "[t]he Republican plan that was offered and rejected by this Board" and to "the plan that was actually adopted by the Board, referred to as the Tilling plan"). The Republican members of the Board submitted their own plan (which was not the Republican Party plan), drafted by Tilling, which the Board adopted. *See* R. 154, Ex. 15, at 89–118 (introduction of the majority members' plan); R. 147, Ex. B., at 24 (noting adoption of the Tilling plan); R. 147, Ex. A, ¶ 14 (same). Comments made by Bennett in reference to a rejected plan, therefore, appear to have no relevance to the motivations behind the plan adopted by the Board and now before this court.

then proceeded to draw "minority districts," including HD 31, HD 39, HD 44, and HD 49, first.[13] R. 104, Ex. 120. The Apportionment Board Findings and Conclusions, adopted in February 1992, show that: the relative percentage of black population in what is now designated HD 31 was increased for the purpose of ensuring the election of a black candidate after the existing incumbent left office; the relative percentage of black population in what is now designated HD 39 was increased for the same reason; and the relative percentages of minority population in HD 44 and HD 49 were intentionally increased. R. 147, Ex. A, ¶¶ 182, 183, 191, 194, 195.[14] We again find that race was a substantial factor in the drawing of the challenged districts. To invoke strict scrutiny of those districts, however, the plaintiffs must also show that the state substantially disregarded or neglected traditional districting principles—that race was the *predominant* factor, the criterion that could not be compromised. *See supra* Part III.A. We hold that the plaintiffs have failed to make this threshold showing.

The plaintiffs do not contend that the challenged districts are noncompact or noncontiguous, or that political subdivisions were not respected. Instead, they have pointed only to `OHIO CONST.`, art. XI, § 7(D) as a principle that the defendants allegedly neglected, or subordinated to race, in the challenged districts. Section 7(D) requires that existing district boundaries (established by the previ-

ous apportionment) be maintained "to the extent reasonably consistent with the requirements of section 3 [dictating the permissible variance in population ratio]...." As we stated above, we need not decide whether the defendants complied with or violated § 7(D); we need only decide whether the defendants pushed § 7(D) aside to meet their racial objectives. First, we note that we doubt that violation or neglect of this single criterion, one out of almost a dozen sections and subsections in Article XI that specifically establish guidelines for drawing districts, would be sufficient to show the kind of flagrant disregard that would indicate that traditional districting principles were subordinated to racial objectives, absent any allegation that other principles were neglected. Second, § 7(D) does not appear to embody a traditional districting criterion previously recognized by the Supreme Court. The plaintiffs do not allege that the defendants did not seek to draw compact, contiguous districts that respected the integrity of political subdivisions (such as wards and precincts), the criteria typically mentioned by the Supreme Court as particularly relevant.

■ Even if the requirement of § 7(D) is a traditional principle, however, we find that it was not subordinated to race. Although Tilling apparently did not always follow § 7(D), as he believed that it conflicted with other Article XI provisions, including the prioritizing standards of § 10, forcing him to violate § 7(D),[15] the evidence does not indi-

---

13. We note that none of the four districts at issue in this case is a majority-minority district; only one of the eight challenged districts, HD 30, is a majority-minority district, and we have held that the plaintiffs do not have standing to challenge that district. The other challenged districts are "influence districts," which are defined as "districts in which black voters would not constitute a majority but in which they could, with the help of a predictable number of cross-over votes from white voters, elect their candidates of choice." *Voinovich v. Quilter*, 507 U.S. 146, 149–50, 113 S.Ct. 1149, 1153–54, 122 L.Ed.2d 500 (1993). *See also* Stanley Pierre–Louis, Comment, *The Politics of Influence: Recognizing Influence Dilution Claims Under § 2 of the Voting Rights Act*, 62 U.CHI.L.REV. 1215 (1995); J. Morgan Kousser, *Beyond Gingles: Influenced Districts and the Pragmatic Tradition in Voting Rights Law*, 27 U.S.F.L.REV. 551 (1993).

14. We note that the Board adopted its Findings and Conclusions in response to this court's order, in the original litigation of the plaintiffs' vote dilution claim, to justify its creation of majority-

minority districts. *Quilter v. Voinovich*, 794 F.Supp. 695, 701–02 (N.D.Ohio 1992). The Board's (perhaps disproportionate) focus on racial considerations in those findings, therefore, is hardly surprising; nevertheless, the Board detailed its use of racial considerations in drawing certain districts in its plan, and we treat those adopted findings as direct evidence of the use of race.

15. *See, e.g.,* R. 350, Ex. A, at 8–10, 14, ¶¶ 10–16, 29–32 (Report of James R. Tilling); R. 123, at 145–46 (12/14/91 Tilling Dep.). We do not address whether Tilling's contention is correct. Although the defendants contend that the Ohio Supreme Court's decision in *Voinovich* affirmed the discretionary authority of the Apportionment Board to choose between conflicting coequal provisions, that court has not yet addressed the question whether § 7 is coequal with certain other provisions, particularly § 10. We need not decide this issue to reach our conclusion; in any event, we would abstain from considering this issue of state constitutional interpretation.

cate that the neglect of § 7(D) was related to Tilling's objective of increasing the percentage of minority population in the challenged districts. Without evidence showing some relation between the use of race and the disregard of customary districting principles—evidence that such principles were *subordinated* to race, rather than coincidentally neglected—the threshold for invoking strict scrutiny is not met. Absent such evidence, we cannot conclude that traditional principles "came into play only after the race-based decision had been made," *see Shaw II*, 517 U.S. at ——, 116 S.Ct. at 1901, rather than having been followed as a matter of course (i.e., "without much conscious thought," *see Bush*, 517 U.S. at ——, 116 S.Ct. at 1955).

We believe this case is factually distinguishable from *Bush*, which was also a "mixed motive" case, in which the defendants admittedly used race in drawing district lines but in which other goals also played a role. In *Bush*, the plaintiffs presented both objective and subjective evidence of racial motivation: a plurality of the Supreme Court agreed with the district court's finding that the challenged districts " 'ha[d] no integrity in terms of traditional, neutral redistricting criteria,' " and state officials conceded that they had deliberately sought to create majority-minority districts. 517 U.S. at —— ——, 116 S.Ct. at 1952–53. That goal had been aided by a computer program that provided quite detailed data on racial composition, but not on other voter demographics. Some traditional principles had been followed: none of the districts was as widely dispersed as the North Carolina district invalidated in *Shaw II*, two of the districts maintained the integrity of county boundaries, all of the districts grouped a city with parts of its suburban area, and incumbency protection was a substantial factor statewide. *Id.* at —— —— ——, 116 S.Ct. at 1953–54.

The *Bush* defendants did not deny that District 30 in Texas showed "substantial disregard" for compactness and regularity, and that the redistricters "pursued unwaveringly" the goal of drawing a majority-minority district. 517 U.S. at ——, 116 S.Ct. at 1955. The plurality opinion stated:

> The record discloses intensive and pervasive use of race both as a proxy [for incumbency protection] ... and for its own sake

in maximizing the minority population of District 30 regardless of traditional districting principles. District 30's combination of a bizarre, noncompact shape and overwhelming evidence that that shape was essentially dictated by racial considerations ... is exceptional.... That combination of characteristics leads us to conclude that District 30 is subject to strict scrutiny.

*Id.* at ——, 116 S.Ct. at 1958.

As to Texas Districts 18 and 29, the *Bush* plurality noted that they were "two of the three least regular districts in the country," and agreed with the district court that "[n]ot only are the shapes of the districts bizarre; they also exhibit utter disregard of city limits, local election precincts, and voter tabulation district lines." 517 U.S. at ——, ——, 116 S.Ct. at 1958, 1959 (citations omitted); *see also id.* at —— — ——, 116 S.Ct. at 1959–60 (quoting the district court's conclusion that "Districts 18 and 29 are formed in utter disregard for traditional redistricting criteria" and were unexplainable on nonracial grounds). Moreover, the district court had found that incumbency protection had been "overwhelmed ... by the State's efforts to maximize racial divisions," and that "the intricacy of the lines drawn, separating Hispanic voters from African–American voters on a block-by-block basis, betrays the critical impact of the block-by-block racial data available" via the computer program. *Id.* at ——, 116 S.Ct. at 1959.

The case before this court is considerably different. Most significantly, there is no evidence, aside from the admitted violation of § 7(D) (which, as we stated above, may not express a traditional principle), to suggest that the defendants disregarded traditional districting principles at all, let alone "utterly." In contrast to the Texas redistricters, the defendants here did not ignore customary criteria in pursuit of their racial objectives. There is no challenge regarding the contiguity or compactness of the districts. The challenged districts do not indicate disregard for political subdivisions, such as the block-by-block gerrymandering of Texas Districts 29 and 30. Also, we note that the fact that Tilling was aided by a computer pro-

gram that provided data on racial composition is not in itself sufficient to demonstrate that race overwhelmed other criteria; *Bush* relied on a "combination of characteristics" to hold that strict scrutiny applied. We do not find a combination of characteristics sufficient to invoke strict scrutiny in this case.[16]

## IV. RATIONAL BASIS SCRUTINY

Having found that strict scrutiny is not applicable to the challenged districts, we now must determine whether a less demanding standard applies, and if so, whether the districts meet that standard.

 Generally, a claim under the Equal Protection Clause is evaluated under a rational basis standard of review. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254 (1985). Racial classifications are almost always subject to strict scrutiny. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493–94, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989). *Shaw I* held, in essence, that in certain "exceptional" cases, an electoral district could be seen as a racial classification; though a district is a facially neutral classification, plaintiffs could invoke strict scrutiny by showing (through disregard of traditional districting principles) that it "could not rationally be understood as anything other than" a racial classification. *See Shaw I*, 509 U.S. at 642–44, 646–47, 649, 113 S.Ct. at 2824–25, 2826–27, 2827–28. If, however, plaintiffs cannot show that race was the "predominant factor" to which traditional districting principles were "subordinated," and thus cannot meet the threshold for triggering strict scrutiny, *see Miller*, 515 U.S. at 915–16, 115 S.Ct. at 2488, it follows that the facially neutral classification (the electoral district) will be subject, at most, to rational basis review.

Arguably, no level of scrutiny is applicable once the plaintiffs fail to meet the threshold established by the *Shaw* cases. *Shaw I* was the first case to recognize the "analytically distinct" claim under equal protection that an electoral district could constitute an unjustified racial classification. Absent a sufficient showing that race was the predominant factor in the creation of the district, perhaps the

claim not only fails to invoke strict scrutiny, but also fails to constitute a valid equal protection claim as recognized by *Shaw I. See, e.g., DeWitt v. Wilson*, 856 F.Supp. 1409, 1415 (E.D.Cal.1994) (Where the court found that a redistricting plan was not racial gerrymandering, because race had been considered along with traditional districting principles, the court held that strict scrutiny was not required and that the plaintiffs had failed to state a claim under *Shaw I.) summarily aff'd. mem.*, 515 U.S. 1170, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995). Under that interpretation of Supreme Court precedent, we would find no valid claim under *Shaw I* and would enter judgment for the defendants.

 In many situations, however, the Supreme Court has applied rational basis scrutiny after it has decided that strict scrutiny is inapplicable. *See, e.g., Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457–58, 108 S.Ct. 2481, 2486–87, 101 L.Ed.2d 399 (1988); *Martinez v. Bynum*, 461 U.S. 321, 328 n. 7, 103 S.Ct. 1838, 1842 n. 7, 75 L.Ed.2d 879 (1983). Therefore, we will subject the challenged districts to rational basis scrutiny. This low level of scrutiny requires that a classification "must be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914 100 L.Ed.2d 465 (1988); *see also Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254 ("rationally related to a legitimate state interest"). We apply this standard with particular deference, given federal courts' reluctance to interfere with state apportionment activities:

> Federal court review of districting legislation represents a serious intrusion on the most vital of local functions. . . . Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests. . . . The courts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus.

---

**16.** Because we hold that strict scrutiny is not triggered, we do not address the issue of whether the defendants had a compelling interest to justi-

fy race-based redistricting, or whether the Board's plan was sufficiently narrowly tailored.

*Miller,* 515 U.S. at 915–16, 115 S.Ct. at 2488; *see also id.* at 905, 115 S.Ct. at 2483 ("[A]pplication of [equal protection] principles to electoral districting is a most delicate task."). We thus hold that an especially deferential standard of scrutiny applies.

■ The Supreme Court has explicitly recognized that redistricting is unique in that legislatures are always aware of race, and that a finding of racial discrimination requires more than mere race consciousness. *See, e.g., Shaw I,* 509 U.S. at 646, 113 S.Ct. at 2826 ("[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of . . . other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination."). In fact, given the demands of the Voting Rights Act, which requires some degree of race consciousness on the part of states engaged in redistricting, consideration of race, in conjunction with (and not in predomination over) other demographic data and traditional districting criteria, clearly is a legitimate state interest.[17] Consideration of other data and application of customary districting principles are also legitimate state interests in the apportionment process—even more so here, where the state has prescribed detailed criteria and practices in the state constitution.

We have no reason to conclude that the districts at issue are not reasonably related to these legitimate interests. As we have discussed above, the plaintiffs have not alleged that the defendants did not follow traditional districting principles, with the lone exception of Article XI, § 7(D) of the Ohio Constitution. Absent any evidence of irrationality, we find that the districts survive deferential scrutiny.

## V. CONCLUSION

Although we find that race was a substantial factor in the drawing of the challenged districts, we find that it was not a "dominant and controlling rationale" to which traditional districting principles were subordinated; rather, race was a factor that was considered within the constraints of those traditions districting principles. We thus hold that strict scrutiny of the challenged districts is not appropriate under governing Supreme Court precedent. Applying rational basis scrutiny, we hold that the Apportionment Board had a rational basis for creating the challenged districts. We therefore enter judgment for the defendants.

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

For the reasons set forth in the memorandum opinion filed contemporaneously with this Judgment Entry, final judgment is rendered for the defendants. Each party to pay its own costs. Case Closed.

JONES, Circuit Judge, dissenting.

At the outset, let me be abundantly clear as to what the plan at issue in this case is *not.* It is *not* an attempt to effectively remedy decades of racially polarized voting in the particular legislative districts involved, as is the case in various pre-clearance jurisdictions. To the contrary, the reapportionment plan here *is* a scheme to *contain,* and will most assuredly limit, the voting power of black electors. The plan, which purports to strengthen black political potential, in a real sense, actually weakens it. The facts of record clearly demonstrate that state apportioning officials engaged in a ruse to limit black voter impact that used as a shield the Voting Rights Act and the Constitution. Because I cannot in good conscience endorse the misuse of these laws that were enacted to remedy the historic denial of voting rights to black Americans, I respectfully dissent.[1] Manipulating the Voting Rights Act, as was done here to accomplish a purpose contrary to the true extension of black voting rights, al-

---

**17.** In the previous opinion of this court, we held that the challenged districts failed strict scrutiny because the defendants did not have a "strong basis in evidence" for believing that they risked liability under § 2. *See Quilter,* 912 F.Supp. at 1027–30. That standard, however, is applicable only to the more demanding "compelling interest" test relevant to strict scrutiny. Here, the more deferential rational basis test requires only that we find a legitimate state interest. *See Clark,* 486 U.S. at 461, 108 S.Ct. at 1914; *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254.

**1.** I agree with the majority's standing analysis. Consequently, only house districts 31, 39, 44, and 49 are at issue in this case.

though skillful and sophisticated, cannot be allowed to overwhelm the long line of precedents aimed at removing the barriers to minority voting and designed to remedy the effects of those barriers. *See Gomillion v. Lightfoot,* 364 U.S. 339, 342, 81 S.Ct. 125, 127–28, 5 L.Ed.2d 110 (1960) (holding that courts must strike down the "sophisticated" as well as "simple-minded" schemes that offend the Constitution); *Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

The way in which the Apportionment Board used black voters in drawing the legislative districts at issue, without first showing polarized or bloc voting, was nothing short of doing a dance on the graves of Medger Evers, Harry T. Moore, Michael Schwerner, Andrew Goodman, James Chaney, and the hosts of others who died in an effort to bring about the enactment of the Voting Rights Act. I write in dissent to further express my profound disagreement with this court's effort, even in good faith, to make constitutional sense out of the Ohio reapportionment officials' paternalistic exploitation of a civil rights remedial statute in order to achieve a dubious political objective. I am astonished at the way the state reapportionment officials dared to act under color of the Voting Rights Act in districts where the very objectives of that Act are already being fulfilled by rational voter conduct. Therefore, I feel obligated to set out with some specificity the reasons I part company with my distinguished colleagues.

## I. Background

Pursuant to the Ohio Constitution, the State Apportionment Board, comprised of five members, must reapportion State House and Senate electoral districts for the state legislature every ten years.[2] Following the 1990 federal census, a majority of the Apportionment Board[3] appointed James R. Tilling to draft an apportionment plan on behalf of the Board. After conducting public hearings throughout the state, including meeting with some members of minority organizations, Tilling drafted a plan that included eight majority-minority districts, districts in which a majority of the population is a member of a specific minority group. *Voinovich v. Quilter,* 507 U.S. 146, 149, 113 S.Ct. 1149, 1153, 122 L.Ed.2d 500 (1993).

Robert T. Bennett, the chairman of the Ohio Republican Party, then submitted the apportionment plan to the Board. He also attached a letter to the plan, which stated in pertinent part:

> [W]e have made every possible effort to achieve maximum possible compliance with federal and state law and constitutions, especially the Voting Rights Act. It was not always possible to reconcile these laws however, and sometimes we were forced to make a choice. There were several occasions when we had to make elections between blind adherence to the Ohio Constitution's dictate regarding population density and preservation of artificial boundary lines on the one hand, and the clear duty to reach out for all reasonably cohesive groups of minority voters. On each occasion, we opted to comply with the Voting Rights Act.
>
> We have therefore sometimes departed from the Ohio Constitution's rigid geographical requirements and mandatory population deviations.... [4]

**2.** Article XI, Section 1 of the Constitution of the State of Ohio provides:

The governor, auditor of state, secretary of state, one person chosen by the speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member, and one person chosen by the legislative leaders in the two houses of the major political party of which the speaker is not a member shall be the persons responsible for the apportionment of this state for members of the general assembly.

Such persons, or a majority of their number, shall meet and establish in the manner prescribed in this Article the boundaries for each of ninety-nine house of representatives districts and thirty-three senate districts. Such meeting shall convene on a date designated by the governor between August 1 and October 1 in the year [1971] and every tenth year thereafter....

OHIO CONST., art. XI, § 1.

**3.** The majority consisted of Defendants George V. Voinovich, Governor of the State of Ohio, Stanley J. Aronoff, President of the Ohio Senate, and Robert A. Taft, II, Secretary of the State of Ohio. In the minority were Plaintiffs Barney Quilter, Speaker Pro Tempore of the Ohio House of Representatives, and Thomas E. Ferguson, Auditor of the State of Ohio.

**4.** This Court's previous findings of fact—still controlling in this case—indicate that the Tilling plan encompassed the same objectives as the Bennett plan:

On October 1, 1991, the Apportionment Board adopted the plan Tilling submitted by a 3–2 vote. *Id.* The Board later reconvened on October 3, 1991, to make several technical amendments to the plan, and the plan, adopted on October 3, 1991, in the wake of these changes, was designated "Amendment C."

On November 1, 1991, Barney Quilter and Thomas Ferguson, the two Board members who voted against the plan, and various other officials and legislators filed suit against the other members of the Apportionment Board and Tilling. Seeking invalidation of the plan, the Plaintiffs alleged that the redistricting plan violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, the Fourteenth and Fifteenth Amendments to the United States Constitution, and Article XI of the Ohio Constitution, which provided specific apportionment guidelines. *Quilter v. Voinovich,* 794 F.Supp. 695, 695–96 (N.D.Ohio 1992). According to the Plaintiffs, the Defendants intentionally "packed minori-ties into certain districts where minorities historically were able to elect representatives of choice with crossover votes." *Id.* at 698. The Plaintiffs contended that this packing resulted in a waste of minority votes in the packed districts and a dilution of minority voting strength in the surrounding areas where the "packed" voters could influence elections. *Id.* In response, the Defendants contended that the plan actually enhanced the strength of black voters by creating safe, minority-dominated districts. As justification for these changes, the Defendants cited compliance with the Voting Rights Act and federal case law, which allegedly mandated the drawing of majority-minority districts. *Id.*

On January 31, 1992, a majority of this three judge panel held that there was "no legal mandate or finding of a Voting Rights Act violation to justify Defendants' creation of majority-minority districts wherever possible in the 1991 Apportionment Plan." *Id.* at 701. Thus, the panel ordered the Board to

This court was not faced with mere race-conscious redistricting that sought to avoid the division of contiguous, cohesive concentrations of minorities. This Court was also not faced with a plan that simply created a substantial number of majority-minority districts without explanation. Finally, this Court was not faced with a state subject to § 5 of the Voting Rights Act, in which case the historical violation of minority has been conclusively established. Rather, this Court addressed an Apportionment Board that *applied a rule mandating the creation of majority-minority districts wherever possible.* The Board did not purport to devise this rule based on Ohio policy and law; rather, it contended that such a per se rule is mandated by federal law.

*Quilter v. Voinovich,* 1992 WL 677145, *2 (N.D.Ohio March 19, 1992) (emphasis added). The earlier finding of this Court squares with the spirit and letter of Robert Bennett, whose plan we previously found to have heavily influenced the ultimate Tilling plan. "Tilling states that, in the most populous counties, he drew boundaries in accordance with his understanding of the requirements of the Voting Rights Act first. Deposition of Tilling, 11/21/91, at 49, 199–206. There were times when he would cross Ohio political boundaries in order to comply with his understanding of the Voting Rights Act. If there had been no Voting Rights Act requirement to create majority-minority districts, he understood that he would not have had to cross Ohio political boundaries.... Tilling had the 'Republican Opportunities' document prior to his submission of the plan and while he was drawing the plan. Deposition of Tilling, 1/22/91, at 17–19." *Quilter,* 1992 WL 677145, *10 n. 8–9. Thus, the Bennett letter says in an outward manner what we found to be the state of affairs based on testimony of the major players, including James Tilling. There were also other influential players and documents. The "Republican Opportunities" documents referred to above discussed 19 ways in which the Republican Party could advantage itself in the redistricting process. The document lists several counties as "opportunities" to "pack as many Demos as possible into 2 Black-majority inner-city [House Districts]." Deposition of Horn, 12/10/91, Ex. 1. The document concludes with a final shot: "Make good on 12 of these opportunities and you know the consequences." *Id.* There were other documents and testimony relied upon by this court to make its factual determination that a racial containment strategy had been followed. Tilling himself—after initially characterizing deposition questioning as a "gross misrepresentation of his actions"—was forced to concede that he had changed districts in every instance in which blacks had been elected with white cross over support. Deposition of Tilling, 11/20/91, at 198–202; *See also* Plaintiff's Proposed Findings of Fact, 12/17/91, ¶¶ 445–545; Deposition of David Horn, 12/10/91, at 44–58. At bottom, we found that, based upon this and other evidence, the engine of race motivated the containment districting strategy used here. Given the record of the case, my position is that strict scrutiny must apply.

draft a new plan or demonstrate that it was remedying a section 2 violation.[5] *Id.* at 702.

The Apportionment Board responded by establishing and adopting a record on February 18, 1992, that, in its view, justified the Board's creation of minority-controlled state legislative districts. Furthermore at its February 18 meeting, the Board amended the 1991 plan to eliminate a series of technical errors in the plan that the Ohio Supreme Court had identified in its separate review of the plan, *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (Ohio 1992) (per curiam). The resulting 1992 plan, "Amendment D," created only five majority-minority districts, which constituted a reduction from the eight majority-minority districts in the 1991 plan, "Amendment C."

On March 10, 1992, after the Board submitted its findings and conclusions, along with the new 1992 plan, this court held that the Board "fail[ed] once again to justify its wholesale creation of majority-minority districts, thus rendering the plan, as submitted, violative of the Voting Rights Act of 1965." *Quilter v. Voinovich*, 794 F.Supp. 756, 757 (N.D.Ohio 1992) (order). Furthermore, this court held that the 1992 plan also violated the Fifteenth Amendment of the United States Constitution. *Id.* Nine days later, in response to Defendants' motion for a stay of the March 10 order pending appeal to the United States Supreme Court, this court additionally held that both the 1991 and 1992 plans violated the Fourteenth Amendment because they departed from the requirement that all districts be of nearly equal population. *Quilter v. Voinovich*, No. 5:91CV–2219, 1992 WL 677145, at *10 (N.D.Ohio Mar. 19, 1992).

The Defendants appealed to the United States Supreme Court. In *Voinovich v. Quilter*, 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993), the Supreme Court reversed this court's *Quilter* decisions. Denying two of the Plaintiffs' claims, the Court held that the reapportionment plan at issue did not violate section 2 of the Voting Rights Act, nor did it violate the Fifteenth Amendment to the United States Constitution. *Id.* Nevertheless, the Court held that the Plaintiffs had established a *prima facie* case that the population deviations between the districts violated the Equal Protection Clause, and the Court remanded "only for further proceedings on whether the plan's deviation from equal population among districts violate[d] the Fourteenth Amendment." *Id.* at 152, 113 S.Ct. at 1154.

Upon remand, this court held that the Ohio reapportionment plan survived scrutiny under the one-person-one-vote guarantee of the Equal Protection Clause because (1) the Defendants advanced a genuine, rational state policy to justify the deviations from population equality among the state legislative districts; (2) their plan reasonably furthered the rational state policy; and (3) the 13.81% and 10.54% total deviations fell within constitutional limits. *Quilter v. Voinovich*, 857 F.Supp. 579, 587 (N.D.Ohio 1994). Accordingly, judgment was entered for the Defendants on this issue.

While the latter decision was pending, however, the Plaintiffs moved this court for permission to amend their complaint in light of the Supreme Court's recent decision in *Shaw v. Reno*, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). As a lower court, this court is bound to follow the Supreme Court's decision in *Reno*, where the Court held for the first time that a plaintiff could state a claim under the Equal Protection Clause by alleging that a districting plan, "though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Id.* at 649–50, 113 S.Ct. at 2828. Thus, this court granted the Plaintiffs' motion, and their complaint was accordingly amended.[6] *Quilter v.*

---

**5.** We declined to address the Plaintiffs' constitutional claims at this point because our analysis under the Voting Rights Act required the plan to be justified or revised. Likewise, because the Ohio Supreme Court, in *Voinovich v. Ferguson*, 63 Ohio St.3d 198, 586 N.E.2d 1020 (1992) (per curiam), was concurrently considering the Plaintiffs' claim under the Ohio Constitution, we abstained from addressing the pendent claim.

**6.** The Plaintiffs' Second Amended Complaint revised the First Amended Complaint in only two respects. First, Count IV, entitled "Violation of the Equal Protection Clause—Segregation of Voters by Race Without Compelling Governmental Justification," is added. Second, the prayer for relief was accordingly revised. In pertinent part, Count IV alleges the following:

*Voinovich,* 157 F.R.D. 36, 40 (N.D.Ohio 1994).

On August 11, 1995, this court found that the 1992 redistricting plan violated the Equal Protection Clause. *Quilter v. Voinovich,* 912 F.Supp. 1006 (N.D.Ohio 1995) (per curiam). Specifically, the panel found that when the legislature subordinates traditional race-neutral districting principles to racial considerations strict scrutiny applies. *Id.* at 1019. Thus, if the Plaintiffs offer proof "substantiating that race was the predominant factor motivating the state's apportionment process, then this gives rise to a presumption that the plan is unconstitutional, and the burden shifts to the Defendants to demonstrate that their use of race in redistricting was narrowly tailored to meet a compelling state interest. . . ." *Id.* (citations omitted).

Having said this, the court then focused on the eight Ohio districts that were allegedly racially gerrymandered. The Defendants admitted that they considered race when redistricting, but argued that such considerations were mandatory under section 2 of the Voting Rights Act. *Id.* at 1023. After reviewing all of the evidence, the panel found that "race was the predominant motivating factor in the Defendants' creation of House districts 21, 22, 30, 31, 38, 39, 44, and 49 in the 1992 plan because traditional districting principles were subordinated to or given less weight in the reapportionment process than racial considerations." *Id.* at 1027. Thus, the court subjected the 1992 plan to strict scrutiny.

All of the foregoing were defended on the basis that the State had a compelling interest. The Defendants argue that they met strict scrutiny because a compelling interest existed—compliance with section 2 of the Voting Rights Act. *Id.* Were that really the case, I would enthusiastically join the majority. However, even under the revised jurisprudence post-*Shaw,* the record does not support that argument. In order to show that section 2 is a compelling state interest the Defendants must have an adequate basis in evidence that race-based redistricting was necessary as a remedial measure to comply with the Voting Rights Act. *Id.* at 1028. This they have not done. To establish this, the Defendants had to show that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* (quoting *Voinovich v. Quilter,* 507 U.S. at 156–57, 113 S.Ct. at 1157 (other citations omitted)). The court found as a matter of fact that such race-based voting did not exist in Ohio with respect to the districts at issue. *Id.* In fact, the court

52. . . . The reapportionment plan adopted by the Defendants on February 18, 1992 intentionally separated Ohio voters on the basis of race without regard for the traditional redistricting principles set forth in the Ohio Constitution and otherwise without any compelling governmental justification. To justify the creation of race-based districts in the urban centers of Ohio, Defendants asserted that there was widespread racial bloc voting throughout Ohio. The trial court specifically found, and the Supreme Court of the United States confirmed, that Ohio did not suffer from legally cognizable racially polarized voting. . . .

53. The Defendants deliberately created race-based legislative districts in urban centers initially and then used the purported, but sham, necessity of creating such districts as the basis for ignoring the traditional anti-gerrymandering provisions of the Ohio Constitution throughout the state of Ohio. Absent the ripple effect of the racial gerrymandering in the urban centers of the state of Ohio, the Defendants would not have been forced to ignore on a wholesale basis the directives of Article XI, Section 7, of the Ohio Constitution to follow existing political and legislative boundaries wherever possible.

54. . . . The decision to abandon the traditional districting mandates contained within the Ohio Constitution is neither compelled by the doctrine of federal supremacy, nor based on any lawful, organized, or rational districting criteria. . . .

55. The Defendants have articulated no compelling governmental interest for the wholesale abandonment of the provisions of the Ohio Constitution. As a result, the Defendants have drawn irregular districts in numerous places throughout the state, districts which have no explanation other than the ripple effects caused by the racially drawn districts in the urban centers. In some instances, the racially drawn districts themselves have irregular shapes not required by the Ohio Constitution.

56. The districts which have been modified solely on the basis of race include House Districts 31, 30, 22, 21, 38, 39, 44, and 49. No evidence has been presented to the trial court that either legally cognizable remedial action was necessary to draw these racially gerrymandered districts, or that the creation of such districts was narrowly tailored to further any compelling governmental need.

Pls.' Second Am. Compl. ¶¶ 52–56.

found significant cross over voting by white voters. For example, the percentage of white cross over votes in each of the challenged districts was as follows: Rep. Mallory—50.66%; Rep. Roberts—45.98%; Rep. Sykes—48.76%; and Rep. Jones—44.46%. *Id.* (citation omitted). Moreover, the 1992 plan expert, Dr. King, analyzed over 200 elections throughout Ohio and found that in 1984 56.7% of whites voted for black candidates. *Id.* at 1029. Even the election board recognized the existence of white cross over voting in the black districts where race-based remedial measures were utilized. *Id.* at 1029 (citing Board Findings ¶ 168). In light of the record, the explanations were suspect. Thus, this court found that no compelling interest existed for the race-based redistricting, and a majority of the panel struck down the plan. *Id.* at 1029–30. The Supreme Court then vacated this decision and asked us to consider it in light of its two new decisions *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), and *Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996).[7]

## II. The Convergence of Race and Precedent

I take pains to write at this length and to place the issue of voting rights and race in a broader framework, because of the confusion that is obvious over the appropriate use of race in civil rights remedial contexts generally and in voting rights cases in particular. *See Shaw v. Reno,* 509 U.S. at 656, 113 S.Ct. at 2831–32 (1993). The confusion is based on the extent to which such remedies must be race sensitive. This confusion may grow from a mistaken notion that Justice John Marshall Harlan's dissenting opinion in *Plessy v. Ferguson,* 163 U.S. 537, 552–564, 16 S.Ct. 1138, 1143–48, 41 L.Ed. 256 (1896), with respect to the Constitution being colorblind, carried the day in 1896. However, Justice Harlan stood alone as the Supreme Court majority rejected his view. Justice Henry Billings Brown, writing for seven of his colleagues, asserted that the Fourteenth Amendment Equal Protection Clause did not

bar the segregation of black citizens so long as the separate treatment of them equaled that accorded to white citizens. *Plessy,* 163 U.S. at 548–49, 16 S.Ct. at 1142–43. In dismissing the arguments of blacks against the validity of that proposition, Justice Brown declared that there was no stigma associated with segregation and to the extent that blacks felt demeaned and stigmatized, it was only because "the colored race [chose] to put that construction upon it." *Id.,* at 551, 16 S.Ct. at 1143.

Conceding that the ground has shifted somewhat in civil rights jurisprudence, this court can conclude, with no need for specific authority, that the harmful impact of *Plessy* misshaped America's institutions. It was 58 years later, in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that the Supreme Court got around to overturning that decision. Since *Brown,* through a series of decisions and statutory enactments, including the Voting Rights Act of 1965, efforts have been made, through the benign use of race, to root out the invidious vestiges of *Plessy v. Ferguson.* Nowhere have these vestiges been more deeply entrenched than in the area of voting rights. At the core of these remedial efforts was a principle that race had to be considered in any efforts to eliminate the effects of the generations of invidiously using race. "In order to get beyond racism, we must first take account of race." *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 407, 98 S.Ct. 2733, 2807–08, 57 L.Ed.2d 750 (1978) (Blackmun, J., concurring). What has led to the grossly mistaken turn in our jurisprudence, and the post-*Shaw* confusion, is the belief that the evils wrought by *Plessy* have been totally eradicated, and that any further remedies designed to address them must be color-blind. The record of coalitional cross over voting in the districts at issue is an encouraging measure of the extent to which the remedial laws have been effective. Nevertheless, in face of this small forward step, I cannot join in a solution that halts, and may

---

**7.** Since the remand, the Supreme Court has also addressed this issue in *Abrams v. Johnson,* —— U.S. ——, at —— ——, 117 S.Ct. 1925, at 1933–34, 138 L.Ed.2d 285 (1997). A careful consideration of the multiple opinions in those cases do not provide any compelling interest validation of a "containment" plan such as this which threatens to impact so adversely on black political participation.

even reverse, the gains made. The record in this case, without question, is at sharp variance with the racial obstinacy in the various pre-clearance jurisdictions and requires a different analysis.

## III. Analysis

It is the aforementioned that derails the train from the compelling purpose track. The majority erroneously concludes that strict scrutiny does not apply to the reapportionment plan in this case. The majority holds that in order for strict scrutiny to be triggered race must be the "substantial factor in the drawing of the challenged districts ... to which traditional districting principles were subordinated...." Maj. Op. at 1051. "[W]e will not apply strict scrutiny without the 'necessary' showing by the plaintiffs that the defendants neglected traditional districting criteria and that neglect is predominantly due to the misuse of race." *Id.* at 1044.' It is of course, unfortunate, in my view, to be required in cases seeking to remedy ages-old discrimination, to prove the obvious about race. Under our prior jurisprudence, this plan would not even meet the intermediate scrutiny test due to its limiting effect on minority voting. Conceding what is required to be shown, I, nevertheless, do not believe that the majority's position accurately states the law with respect to a plan that negatively impacts minority political potential. The recent cases require that even under the majority's test, strict scrutiny applies to the state's reapportionment containment plan.

### A. The Test

In *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (*Shaw I* ), the Supreme Court first ruled actionable an equal protection claim that challenged districts which were drawn based on the race of the voters. Since then the Court has attempted to further define when states violate the Equal Protection Clause in redrawing their districts.

Of course, redistricting legislatures are always conscious of racial demographics; "but it does not follow that race predominates in the redistricting process." *Miller,* 515 U.S. at 915–16, 115 S.Ct. at 2488. Because it is difficult to distinguish between a legislature merely taking account of race and a legislature that is motivated by race, courts must exercise "extraordinary caution" in adjudicating such claims. *Id.; see also Shaw v. Hunt,* 517 U.S. 899, ——, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207 (1996) (*Shaw II* ). If race, however, is the predominant factor motivating a legislature to place a significant number of voters within or without a particular district, then this court must apply strict scrutiny to the redistricting plan. *Abrams v. Johnson,* — U.S. ——, ——, 117 S.Ct. 1925, 1936, 138 L.Ed.2d 285 (1997) ("If race is the predominant motive in creating districts, strict scrutiny applies ....") (emphasis added); *Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1900 (holding that the constitutional wrong occurs when race becomes the "dominant and controlling" consideration); *Miller,* 515 U.S. at 913–16, 115 S.Ct. at 2487–88.

Consequently, the court does not need to look at whether race trumped other districting principles, but instead must determine whether race was the main factor the legislature considered when drawing its district lines. I do not dispute that the districts are compact and contiguous in this case, but that should not allow a legislature to shield its plan from review, especially where irrespective of the shape of the districts race remained the primary motivation. *Compare Miller,* 515 U.S. at 915–16, 115 S.Ct. at 2488 (holding that in order for strict scrutiny to apply race must be the "predominant factor motivating the legislature's [redistricting] decision") *with Bush,* 517 U.S. at —— – ——, 116 S.Ct. at 1973–74 (Thomas, J., concurring) (stating that strict scrutiny should apply when race is a motivation for the drawing of districts). Indeed, the line of recent Supreme Court cases do not seem to abandon altogether benign considerations of race in the redistricting process. *See Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1902 ("A State's interest in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions"); *Bush,* 517 U.S. at ——, 116 S.Ct. at 1969 ("so long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may otherwise take race into consideration, without coming under strict scrutiny") (O'Connor, J., concurring); *Bush,*

517 U.S. at —, 116 S.Ct. at 1971 ("The State may not engage in districting based on race except as reasonably necessary to cure the anticipated § 2 violation, nor may it use race as a proxy to serve other interests") (Kennedy, J., concurring). These cases attempt to define when racial considerations as such are appropriate. In my view, the discriminatory intent manifest in the development of this plan moved beyond benign considerations of race into invidious uses for containment purposes. To hold, as the majority does, that "subordination" can only be proven if a state abandons or violates traditional districting principles in favor of racial considerations constitutes a logical fallacy. Such a conclusion is fallacious because it is certainly possible, both logically and factually, that districts could be crafted within the confines of traditional districting principles and still be predominantly motivated by discriminatory racial considerations. *See Abrams*, 517 U.S. at —, 117 S.Ct. at 1936 (stating that if race is the predominant motive strict scrutiny applies). Furthermore, to conclude otherwise accords a preclusive constitutional significance to a state's compliance with traditional districting principles, which exceeds the significance accorded by the Supreme Court. *See Shaw II*, 517 U.S. at —, 116 S.Ct. at 1900; *Miller*, 515 U.S. at 917–23, 115 S.Ct. at 2489–91.

Taken together, the sum of the Supreme Court's decisions leads me to conclude that a plaintiff may satisfy the predominant factor test and prove that traditional districting principles were a subordinate motivation not only when a state violates or abandons traditional districting principles in favor of racial motivations, but also when a state substantially complies with traditional districting principles and there is nevertheless a strong discriminatory motivation.

### B. Application

In the case at bar, the record is replete with evidence that race was the predominant motivation of the state officials when they drew the districts at issue. In fact, there is substantial evidence in the record indicating that back room decisions such as those outlawed in *Gomillion v. Lightfoot* have made a mockery of the substantial racial progress with respect to voting patterns in the districts at issue.

When the plan was submitted as a whole to the Board, the letter attached stated, "There are several occasions when we had to make election between blind adherence to the Ohio Constitution's dictate regarding population density and preservation of artificial boundary lines on the one hand, and the clear duty to reach out for all reasonably cohesive groups of minority voters. On each occasion, we opted to comply with the Voting Rights Act." Robert T. Bennett Letter (September 26, 1991). This letter declares in clear terms that when the districting board had to choose between race and traditional districting principles, they chose race. Were minorities shown to lack meaningful cross over support, such action by the Board would have been laudable. In the face of cross over voter evidence on the record, it stands to reason that the districting board made the wrong choice. *Abrams*, — U.S. at —, 117 S.Ct. at 1937.

James Tilling's (the state expert who drew up the plan) actions in developing the plan are direct evidence of the apportionment board predominantly using race. The record clearly establishes that Tilling first set out to draw minority districts. He testified, without equivocation, that his first goal was to gather data on his computer on black populations and black voting age population by district, ward, or precinct. He then drew the black districts first by aggregating black populations on his computer and drawing lines around those populations. *Deposition of James Tilling*, Docket # 102, at *84–91, *97–106 (11/20/91). He further admitted that the black population was needlessly added to districts already represented by black legislators. This was to "ensure that black persons would be elected in the future."

All of these tactics are further buttressed by Tilling's hand-written notes. Finally, throughout his report Tilling relies upon the untenable and prejudicial presumption that all blacks have similar income, education, housing values, health, and criminal justice concerns. *Tilling's Report* at ¶ 70. Tilling *never* advanced a claim, statistical evidence or a mere guess that discriminatory voting patterns necessitated his actions. Evidence of black candidates being rejected by white

voters in the legislative districts under review would have provided justification, indeed, would have compelled the affirmative use of race.

The Board's justification for the districts in question highlight that race was not only the primary motivation, but the only motivation in drawing these districts. Again, I emphasize that race was used here in a way to contain, not enhance, black political empowerment. Racial voting patterns in the following four legislative districts powerfully demonstrate the cynical restraint placed on the ability to strengthen and broaden minority political potential and also show an absence of an appropriate predicate for invoking the Voting Rights Act remedies.

### 1. House District 31 (House District 23 in 1981)—Hamilton County

Board Finding ¶ 182 states that this district's black population was increased to insure a black candidate was elected when Representative Mallory retired. Furthermore, the Board Findings indicate that Floyd Johnson, the man purporting to represent the NAACP, gave his approval for these racially gerrymandered districts. *Id.* at ¶ 8.[8]

A cursory glance at the Board Findings exemplifies that race was the most important factor in redrawing the districts. These Findings were adopted in support of the 1992 Plan now at issue.

Tilling's notes further indicate that prior to drawing this district he displayed the minority population on his computer screen and he drew this district first to emphasize a heavily populated black district. While this relates to a draft of the finished version, it indicates Tilling's and the Board's intent when drawing this district.

The Board should not have taken race into account at all in this district. In 1990, 50.66% of the white voters voted for the black representative. *Quilter,* 1992 WL 677145, at *10 n. 2. Furthermore, 28.23% of the white voting age population voted, while only 12.63% of the black population did so. *Board Finding* at ¶ 168. The black voting age population was only 39% of the popula-

tion in this district. Therefore, the black representative could have run in an all white district and won.

### 2. House District 39 (House District 37 in 1981)—Montgomery County

Paragraphs 191 to 193 of the Board's findings indicate that their primary concern in drawing new House District 39 was to circumscribe black voters. In fact, these findings seem to indicate that race was the Board's only concern.

The Board considered Old Districts 36 and 37 simultaneously, when they attempted to redraw the districts in Montgomery Country. *Board Findings* at ¶ 191–93. Both of these districts had minority representatives, and in both districts minorities had been elected with less than a majority-minority population. *Id.* at ¶ 191. Yet, the Board found it imperative to increase the minority population in these districts. *Id.* at ¶ 193 ("But in order to barely give her the majority black voting age population, 50.7, which is, we felt, the least that we needed to do ... if we didn't increase it now, it would fall dangerously low and possibly jeopardize her chances for reelection."). The Board did this and ignored the fact that in Old House District 37, 45.98% of the white voters crossed-over and voted for the black candidate. *Quilter,* 1992 WL 677145 at *10 n. 2.

### 3. House District 44 (House District 42 in 1981)—Summit County

Again, the Board found it necessary to first consider race in District 44. In fact, both Floyd Johnson and the Black Elected Democrats of Ohio ("BEDO") participated in reconfiguring this district. *Board Findings* at ¶ 194. The Board, Floyd Johnson, and BEDO all agreed that the district needed to be reconfigured so as to have a larger black voting age population. *Id.* This was their sole and primary purpose in drawing District 44.

Once again, however, in Old District 42, the black representative received 48.76% of the white population's votes. *Quilter,* 1992

---

**8.** While Mr. Johnson claims to have represented the NAACP's wishes, the NAACP never officially sanctioned his work.

WL 677145, at *10 n. 2. Furthermore, in that district blacks only made up 32.01% of the voting age population. *Board Findings* at ¶ 168. Thus, once again it was whites who elected a black candidate (the black representative had been elected to five terms by a two-to-one margin). Race should not have been considered here, but obviously was the primary consideration. Moreover, the Summit County districts showed population shifts that were constitutionally insignificant. *See Tilling's Report* at ¶ 49.

### 4. House District 49 (Old House District 45)—Lucas County

Mr. Tilling testified to the Board that in this district they did not need to increase the minority population to protect the incumbent black representative, "but because down the road in this decade whoever is his successor needs the opportunity to give minorities a clear chance to elect a candidate of their choice." *Board Findings* at ¶ 177. There obviously was a strategy to increase percentages based on race with no predicate existing for doing so. *Id.* at ¶ 195.

In 1990, the black representative received 44.46% of the white vote in Old District 45. *Quilter,* 1992 WL 677145, at *10 n. 2. Blacks only made up 37.61% of the voting age population. *Board Findings* at ¶ 168. Finally, this district had very little shift in population. *Tilling's Report* at ¶ 49. The only reason it was changed was to increase the number of minority voters.

### C. Strict Scrutiny

The record establishes a simple fact: Ohio voters in these state legislative contexts have demonstrated a "general willingness" to look beyond race in electing public officials. *Abrams,* —— U.S. at ——, 117 S.Ct. at 1937. With a well-established record of non-polarized voting in the challenged districts, the Apportionment Board's drawing of racially-packed legislative districts can only be the result of a predominant motivation to do so. Consequently, I would subject the plan to strict scrutiny.

Under strict scrutiny, the Defendants must show "not only that its redistricting plan was in pursuit of a compelling state interest, but also that 'its districting legislation is narrowly tailored to achieve [that] compelling state

interest.'" *Shaw II,* 517 U.S. at ——, 116 S.Ct. at 1902 (quoting *Miller,* 515 U.S. at ——, 115 S.Ct. at 2490). In this case, the state asserts that compliance with section 2 of the Voting Rights Act is a compelling state interest. The Supreme Court has "assumed, without deciding, that compliance with § 2 can be a compelling state interest." *Abrams,* —— U.S. at ——, 117 S.Ct. at 1936. I believe that when the Supreme Court ultimately decides this issue, the Court will find that compliance with section 2 of the Voting Rights Act is a compelling state interest. *See Bush,* 517 U.S. at —— - ——, 116 S.Ct. at 1968–70 (O'Connor, J., concurring).; Maj. Op. at 1044.

However, section 2 of the Voting Rights Act does not justify the compartmentalization of racial minorities into separate voting districts unless it is demonstrated that such action would promote their meaningful participation in the political process. Thus, section 2 is far from a blind justification for race-based redistricting. Rather, the state must have an adequate basis in evidence to conclude that race-based redistricting is necessary to correct bigoted voting patterns so as to comply with the Voting Rights Act. *See Abrams,* —— U.S. at ——, 117 S.Ct. at 1935 ("A violation of § 2 occurs if 'it is shown that the political process leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial minority] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'") (quoting 42 U.S.C. § 1973(b)).

Generally, to establish a *prima facie* case that a single-member redistricting plan violates section 2, three things must be shown: (1) that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group "is politically cohesive"; and (3) "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2767, 92 L.Ed.2d 25 (1986) (referred to hereinafter as "*Gingles*

factors"). Consequently, when a state has reliable information that indicates the, relevant minority group could establish a *prima facie* challenge under section 2 of the Voting Rights Act to the existing districting plan, then it has a strong basis in evidence for concluding that it must engage in race-based redistricting to comply with section 2, and it has established a "compelling interest" for the remedial measures.

In this case, even if the court were to assume that the Defendants possessed information suggesting that a minority group could satisfy the first two *Gingles* factors, the Defendants could not satisfy the racial-bloc voting prong in the relevant districts. In fact, both this court and the Supreme Court previously held that on the basis of all the evidence that racially polarized voting generally did not exist in Ohio's legislative elections. The Court noted the following:

> [A]ppellees [Plaintiffs in this case] have failed to demonstrate *Gingles'* third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice. The District Court specifically found that Ohio does not suffer from "racially polarized voting." Even appellees agree. Here, as in *Gingles,* "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters."

*Voinovich v. Quilter,* 507 U.S. 146, 158, 113 S.Ct. 1149, 1157–58, 122 L.Ed.2d 500 (1993) (internal citations omitted); *see also Quilter,* 1992 WL 677145, at *4, *8 & n. 2, n. 3 (holding that Ohio has coalitional voting, where whites cross over and vote for black candidates, and not polarized voting, where whites only vote for white candidates and blacks vote for black candidates). By relying on these precedents, I am not saying that the Apportionment Board could not take race into account unless and until it had been proven in a court that a violation of section 2

of the Voting Rights Act had occurred. A state is not required to await a judicial finding that it has committed past or present discrimination before it voluntarily takes remedial action to eradicate the discrimination, so long as it has a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 500, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989) (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1848–49, 90 L.Ed.2d 260 (1986)). My point, however, is to emphasize that which should have been reasonably apparent to the Defendants: racially polarized voting does not exist in the contested districts. In the four districts at issue, between 45% and 51% of the white voters voted for the black candidate. *See Quilter,* 1992 WL 677145, at *10 n. 2; *see id.* at *10 n. 3 (finding that in 1984 56.7% of white voters voted for the black incumbent, in 1988 60.2% of white voters voted for the black incumbent, and in 1988 67.8% of white voters voted for the black incumbent). Given the overwhelming evidence of coalitional voting in the challenged districts under the existing plan and given the fact that the Defendants had this information available to them before they adopted the 1992 plan, the Defendants could not reasonably conclude that the relevant minority group could establish a *prima facie* case of a violation of section 2 of the Voting Rights Act in the four relevant districts.[9] Consequently, the state does not have a compelling interest to use black voters as a proxy for its redistricting, and the plan should be struck down.

## IV. Conclusion

The policy of racial political containment in this case removes the plan from the same category of remedial attempts present in jurisdictions where white voters continue in their refusal to vote on an interracial coalitional basis for non-white candidates. Because of that difference, and the lack of an

---

9. The pending case is extremely similar to the facts of *Abrams v. Johnson, supra.* In that case, the plaintiffs alleged a section 2 violation. The plaintiffs, however, could not establish the three threshold *Gingles* conditions. *Id.* at ——, 117 S.Ct. at 1936. In Georgia, the district court found that the "average percentage of whites voting for black candidates ... ranged from 22%

to 38%...." *Id.* at ——, 117 S.Ct. at 1936. "Under these circumstances, we cannot say the district court clearly erred in finding insufficient racial polarization in voting to meet the *Gingles* requirements." *Id.* If the Court found voting in Ohio. insufficient racial polarization in Georgia, I have no doubt that they will find insufficient racial polarization in voting in Ohio.

adequate predicate, the Apportionment Board, therefore, lacks a compelling interest for its racial containment scheme. The four districts at issue, as drawn, violate the Equal Protection Clause of the Fourteenth Amendment. I dissent.